12 F.3d 1549
 Bankr. L. Rep. P 75,680
In re MERIDITH HOFFMAN PARTNERS, a Colorado general
partnership; Meridith Millard Partners, a
Nebraska general partnership, Debtors.
H. Christopher CLARK, Trustee of the Bankruptcy Estates of
Meridith Hoffman Partners and Meridith Millard
Partners, Plaintiff-Appellee,
v.
BALCOR REAL ESTATE FINANCE, INC., an Illinois corporation,
Defendant-Appellant.
 No. 92-1337.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 28, 1993.
Rehearing Denied Jan. 20, 1994.
 
 Raymond E. Stachnik of Katten Muchin & Zavis, Chicago, IL (Francis X. Grossi, Jr., and Paul A. Haskins of Katten Muchin & Zavis, Chicago, IL, and Tom H. Connolly and Mary Scherschel Brady of Gibson, Dunn & Crutcher, Denver, CO, with him on the briefs), for defendant-appellant.
 Bonnie A. Bell (John B. Wasserman with her on the briefs) of Katch, Sender, Wasserman & Jobin, Denver, CO, for plaintiff-appellee.
 Before McKAY, ANDERSON, and EBEL, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Balcor Real Estate Finance, Inc. appeals on two grounds from the district court's decision affirming the bankruptcy court's ruling that the trustee in bankruptcy could recover from Balcor preferential payments it received during the year preceding the bankruptcy petition. 145 B.R. 682. First, Balcor argues that the payments it received from the debtors, Meridith Hoffman Partners and Meridith Millard Partners, were not avoidable because they were made in the ordinary course of business. See 11 U.S.C. Sec. 547(c)(2). Second, Balcor argues that the extended one-year preference period should not apply to the payments it received from the debtors. See id. Sec. 547(b)(4)(B). We conclude that the debtors did not make the payments to Balcor "according to ordinary business terms" as required by section 547(c)(2)(C), and that the one-year preference period does apply. We therefore affirm the district court on both issues.
 
 BACKGROUND
 
 2
 Meridith Hoffman Partners and Meridith Millard Partners were general partnerships that each owned and operated a single shopping center. Lawrence Fiedler was the controlling and managing general partner of both partnerships.
 
 
 3
 After buying their shopping centers at the end of 1984, both partnerships borrowed money from Balcor, a mortgage lender for commercial real estate developments. Meridith Hoffman borrowed $3,550,000 and Meridith Millard borrowed $5,300,000. Fiedler and the Meridith Organization, Inc. guaranteed both loans. Appellee's Supp.App. Tab 1. Although the loans were secured by deeds of trust and assignments of rents, Balcor was an undersecured creditor in bankruptcy because it did not perfect its assignments of rents before the bankruptcy petitions were filed.
 
 
 4
 The partnerships each signed escrow agreements with Balcor over a year after signing the original promissory notes. The bankruptcy court found that both partnerships were in default when they entered the escrow agreements. Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners), No. 91-1338-SBB, slip op. at 2-3 (Bankr.D.Colo. Apr. 30, 1992). Under the escrow agreements, the escrow agent deposited all rents from the shopping centers into an escrow account. The property manager could make disbursements from this account only after Balcor approved them.
 
 
 5
 Fiedler and others filed an involuntary Chapter 11 petition against the partnerships, which was later converted to a Chapter 7 liquidation, thirty-one months after the Meridith Hoffman escrow agreement was signed and seventeen months after the Meridith Millard escrow agreement was signed. The trustee sought to avoid as preferences for the benefit of an insider all payments to Balcor during the year preceding the bankruptcy petitions. During the preceding year, Meridith Hoffman had paid Balcor $140,128.94 and Meridith Millard had paid Balcor $255,722.44. The bankruptcy court held that the payments to Balcor were preferences for the benefit of an insider, and did not qualify for the ordinary course exception in section 547(c)(2). The district court affirmed then Balcor appealed.
 
 DISCUSSION
 I. Ordinary Course of Business Exception
 
 6
 Balcor admits that the disputed transfers are preferences under section 547(b), but argues that they are not avoidable because they meet the ordinary course of business exception in section 547(c)(2). Balcor has the burden of proving that the payments qualify for the exception. See 11 U.S.C. Sec. 547(g). The bankruptcy court concluded that the debtors did not make the payments in the ordinary course of business. Because this conclusion is primarily factual, we must accept it unless it is clearly incorrect. Fidelity Sav. & Inv. Co. v. New Hope Baptist, 880 F.2d 1172, 1177 (10th Cir.1989) (per curiam).
 
 
 7
 The trustee may not avoid a preferential transfer if the underlying debt was incurred in the ordinary course of the parties' business, the payments were made in the ordinary course of the parties' business, and the payments were "made according to ordinary business terms." 11 U.S.C. Sec. 547(c)(2). Because we conclude that the payments were not made according to ordinary business terms, we do not discuss whether they meet the other two requirements.
 
 
 8
 The Code does not define "ordinary business terms." The phrase could mean terms that creditors in similar situations commonly would use, even if the situation itself is extraordinary. See Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns), 9 F.3d 680, 685 (8th Cir.1993) ("Subsection (c)(2)(C) ... requires evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems."); Morris v. Kansas Drywall Supply Co. (In re Classic Drywall, Inc.), 121 B.R. 69, 75 (D.Kan.1990) ("If an accepted or common practice of the industry, it is an 'ordinary business term.' "). Or it could mean terms that are used in usual or ordinary situations. We think that the purposes of the preference section suggest the latter meaning.
 
 
 9
 The purpose of the ordinary course exception is "to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), 1978 U.S.C.C.A.N. 5787, 5874. The preference section does not discourage "unusual action" simply because others in the industry wouldn't respond to similar circumstances in the same way. It discourages "unusual action" that may favor certain creditors or hasten bankruptcy by alarming other creditors and motivating them to force the debtor into bankruptcy to avoid being left out. See In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1032 (7th Cir.1993); Harman v. First Am. Bank (In re Jeffrey Bigelow Design Group, Inc.), 956 F.2d 479, 488 (4th Cir.1992) (holding that payments were in ordinary course because, although not common, they did not favor certain creditors or encourage a race to dismember the creditor); Courtney v. Octopi, Inc. (In re Colonial Discount Corp.), 807 F.2d 594, 600 (7th Cir.1986) ("The obvious extra 'ordinary' transaction is one designed to give the transferee an advantage over other creditors in bankruptcy."), cert. denied, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 526 (1987). Ordinary business terms therefore are those used in "normal financing relations": the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy. Such terms do not raise the dangers that the preference section seeks to avoid. Even arrangements that creditors commonly try to use when a debtor is struggling may give a creditor an advantage over others and precipitate bankruptcy. For example, filing a lawsuit to enforce a debt may not be unusual when a debtor does not pay, but payments according to a settlement agreement are not according to ordinary business terms. Cf. Gull Air, Inc. v. Beech Acceptance Corp. (In re Gull Air, Inc.), 82 B.R. 1, 3-4 (Bankr.D.Mass.1988) (holding that payments according to a settlement agreement were not in the ordinary course of business because a lawsuit is an unusual collection method).
 
 
 10
 The escrow arrangement with Balcor was not a normal financing relationship. The record shows that creditors in the industry use such an arrangement only in extraordinary circumstances, when debtors are in trouble. Appellee's Supp.App. Tab 3, at 127, 129-32, 141-42. The record also suggests that Balcor entered the escrow agreement with the debtors because the debtors were delinquent and Balcor was worried about getting paid. Id. at 70.[1] Furthermore, the escrow agreement enabled Balcor to favor itself. Balcor occasionally used this power to make sure that money was available for itself by denying other payments. The record supports the finding that Balcor used its authority to delay payments to other creditors and to pay its mortgage first. Id. Tab 6, at p 6, Tabs 8-9.[2] Balcor also conditioned payments to trade creditors upon receipt of payments to itself and denied payment of certain expenses. See id. Tabs 10-13. The payments therefore were made according to terms that were not used in normal or ordinary situations and that made it possible for Balcor to favor itself, thus increasing the risk of bankruptcy as well. The payments to Balcor were not made according to ordinary business terms and do not qualify for the exception in section 547(c)(2).
 
 II. One-Year Preference Period
 
 11
 The bankruptcy court held that the trustee could avoid the debtors' payments to Balcor made during the year preceding the bankruptcy filing. The court followed our precedent in reasoning that the extended one-year preference period applied because the payments were "for the benefit of" two "insiders," Fiedler and the Meridith Organization, who had guaranteed the debt to Balcor and who thereby received more on their contingent claims than they otherwise would have received. See 11 U.S.C. Sec. 547(b); Manufacturers Hanover Leasing Corp. v. Lowrey (In re Robinson Bros. Drilling, Inc.), 892 F.2d 850 (10th Cir.1989) (per curiam) (adopting opinion in Lowrey v. First Nat'l Bank (In re Robinson Bros. Drilling, Inc.), 97 B.R. 77 (W.D.Okla.1988)). Balcor argues that Robinson Bros. does not justify the extended preference period in this case and that if it does we should overrule it. We must accept the bankruptcy court's factual findings unless clearly erroneous, but we do not defer to its legal conclusions. Fidelity Sav., 880 F.2d at 1174. We conclude that Robinson Bros. correctly interprets the Bankruptcy Code and does permit extended recovery in this case.
 
 A. Equal Treatment of the Outsider Creditor
 
 12
 We disagree with Balcor's argument that the trustee should not be able to recover any payments made before the regular ninety-day preference period because the debtors did not treat Balcor better than other creditors. Although Congress intended the extended preference period to prevent unequal distribution motivated by benefit to insiders, the statute does not require any proof that the debtor actually did favor the insider, or the initial transferee in cases like this. The statute only requires proof that the insider received more on his claim than he would have received otherwise. 11 U.S.C. Sec. 547(b)(5). Even if the debtor had no intention of favoring the insider, payments to an unsecured insider that are not in the ordinary course of business will be avoided up to one year before bankruptcy while similar payments to other creditors will be avoided only up to ninety days. See T.B. Westex Foods, Inc. v. FDIC (In re T.B. Westex Foods, Inc.), 950 F.2d 1187, 1195 (5th Cir.1992) (explaining that equality of distribution is equally important even if preferences were involuntary and debtor obviously was not intentionally preferring the creditor). It does not matter whether the debtors actually favored Balcor; all that matters in deciding whether to apply the extended preference period is whether the transfers that benefited the insider guarantors enabled them to receive more on their contingent claims than they would have received in bankruptcy without the transfers.
 
 
 13
 If the debtor truly does not treat the creditor any better than other creditors, the transfers usually will be in the ordinary course of business and thus will not be avoidable at all. Some courts have refused to allow extended recovery in insider guarantor cases because they thought that doing so would make the ordinary course defense meaningless by letting the trustee avoid transfers regardless of any defenses the outsider creditor may have. See Performance Communications, Inc. v. First Nat'l Bank (In re Performance Communications, Inc.), 126 B.R. 473, 476-77 (Bankr.W.D.Pa.1991). Even if a transfer is avoidable under section 547(b) because of benefit to a creditor other than the initial transferee, the exceptions apply to the transfers, not to the creditors. If a transfer was "in payment of a debt incurred ... in the ordinary course of business," for example, it is not avoidable and cannot be recovered under section 550(a) from anyone, whether initial transferee or the creditor for whose benefit the transfer was made. However, as we have already explained, Balcor did receive special treatment in the manner of payment and thus has not proved that the disputed transfers were in the ordinary course of business.
 
 B. "For the Benefit of" Insider Guarantors
 
 14
 The preference section will extend the preference period to one year only "if such creditor at the time of such transfer was an insider." 11 U.S.C. Sec. 547(b)(4)(B). "Such creditor" refers to the only previous mention of creditor in section 547(b), which says that a preference must be "to or for the benefit of a creditor." Id. Sec. 547(b)(1). Therefore the one-year preference period may apply only if the transfers were made "for the benefit of" an insider creditor.
 
 
 15
 Balcor does not dispute that Fiedler and the Meridith Organization were insiders and creditors, but argues that the payments were not for their benefit because they did not benefit financially. Balcor claims that the bankruptcy court incorrectly held that the insiders benefited by the delay of foreclosure, because considering non-pecuniary benefits as a benefit under (b)(1) is inconsistent with the requirement that the creditor receive more on his claim under (b)(5). See Travelers Ins. Co. v. Cambridge Meridian Group, Inc. (In re Erin Food Servs., Inc.), 980 F.2d 792, 800-01 (1st Cir.1992) (holding that delaying bankruptcy proceedings was not a "benefit" to an insider because benefit under (b)(1) means only "a quantifiable monetary reduction in the insider-creditor's contingent claim").
 
 
 16
 We need not decide whether a delay in foreclosure is a benefit under (b)(1), however, because the bankruptcy court also correctly found that the insiders did benefit financially from the payments to Balcor. The court observed that the insider guarantors benefited from a reduction in their exposure on the guaranties. Clark, No. 91-1338-SBB, slip op. at 5. Reducing potential liability on the guaranties financially benefited the guarantors. See Lowrey v. Manufacturers Hanover Leasing Corp. (In re Robinson Bros. Drilling, Inc.), 6 F.3d 701, 703 (10th Cir.1993) (explaining that insider guarantor clearly benefits from reduction in his contingent liability and thus reduction in his contingent claim against debtor); Erin Food Servs., 980 F.2d at 797 ("There can be no question that an insider-guarantor derives measurable economic benefit from a payment on the guaranteed debt, to the extent the insider's contingent liability on the personal guaranty is reduced."); Levit v. Ingersoll Rand Fin. Corp., 874 F.2d 1186, 1190, 1194 (7th Cir.1989).
 
 
 17
 Balcor argues that the insiders did not benefit from a reduction in potential liability because they were insolvent and soon to enter bankruptcy themselves, so they would never have had to pay on their guaranties anyway. Whether a transfer is for the benefit of a creditor is determined at the time of the transfer, however. Robinson Bros., 6 F.3d at 704. At the time of the transfer, the insiders were still liable on their guaranties. A reduction in that potential liability is a benefit even if the guarantor is hopelessly insolvent. Id. at 703; Official Unsecured Creditors Comm. of Suffola, Inc. v. U.S. Nat'l Bank (In re Suffola, Inc.), 2 F.3d 977, 986 (9th Cir.1993) ("Insolvency is transitory, or at least not inherently permanent. A decrease in the degree of insolvency, like an increase in the degree of solvency, is beneficial.").
 
 
 18
 C. "Such Creditor" Received More Than in Bankruptcy
 
 
 19
 As we already have explained, subsection (b)(5) requires that the insider creditor received more of his contingent claim than he would have received in bankruptcy. See Ray v. City Bank & Trust Co. (In re C-L Cartage Co.), 899 F.2d 1490, 1493 (6th Cir.1990) (noting that (b)(1), (4), and (5) all refer to the same creditor, so the one-year period applies only if the insider guarantor received more than he would have otherwise). Regardless of whether non-pecuniary benefits satisfy (b)(1), the trustee must always prove that the insider guarantor benefited financially as described in (b)(5).
 
 
 20
 Although the bankruptcy court mistakenly considered whether Balcor received more than it would have received in bankruptcy, the record clearly shows that the insider guarantors also received more on their contingent claims against the debtors than they would have received in bankruptcy. The payments to Balcor simultaneously reduced the insiders' contingent claims against the debtors. Because the insider guarantors were unsecured, they would have received only a fraction of those amounts in bankruptcy. See Elliott v. Frontier Properties (In re Lewis W. Shurtleff, Inc.), 778 F.2d 1416, 1421 (9th Cir.1985); Appellee's Supp.App. Tab 16.
 
 
 21
 Again, Balcor insists that the insider guarantors did not receive anything from the transfers because the insiders were insolvent and would not have had to pay on their guaranties in any event. However, (b)(5) does not say that the creditor ultimately must have benefited from receiving more on his claim. Actual benefit is irrelevant because the preference section is not strictly punitive. One of its primary purposes is to assure equality of distribution according to the statutory scheme. If the debtor favored a certain creditor because it reduced an insider's exposure, it would not matter whether the insider guarantor ultimately did not have to pay on the guaranty. The debtor still spent money that would have been part of the estate and available for fair distribution to all creditors. The result might be different if the insider was discharged in bankruptcy before the debtor's bankruptcy filing, because then the insider would not have a claim at all in the debtor's bankruptcy, but that is not the case here. See Suffola, 2 F.3d at 986.
 
 
 22
 We therefore conclude that the insider guarantors did receive more on their claim, regardless of their insolvency and eventual bankruptcy, and that Robinson Bros. supports extending the preference period in this case.
 
 
 23
 D. Arguments to Overrule Robinson Bros.
 
 
 24
 Balcor also offers several reasons that we should overrule Robinson Bros. if we conclude that it does apply in this case. However, a three-judge panel cannot overrule an earlier decision by the circuit. See, e.g., United States v. Rockwell, 984 F.2d 1112, 1117 (10th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 2945, 124 L.Ed.2d 693 (1993). Even if we could, Balcor's arguments do not justify overruling Robinson Bros.
 
 
 25
 First, Balcor complains that permitting extended recovery in insider guarantor cases raises the cost of commercial capital because lenders can't rely as much on insider guaranties. See Weiskopf v. New York Job Dev. Auth. (In re J.T.L. Supermarket Corp.), 145 B.R. 3, 4 (Bankr.N.D.N.Y.1992). Balcor also argues that it unfairly penalizes prudent lenders who get borrower guaranties. See Official Creditors' Comm. of Arundel Hous. Components, Inc. (In re Arundel Hous. Components, Inc.), 126 B.R. 216, 219 (Bankr.D.Md.1991). Such considerations may motivate Congress to amend the statute, but they do not permit courts to disregard the clear language of a statute. See Union Bank v. Wolas, --- U.S. ----, ----, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991) ("The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning."); C-L Cartage, 899 F.2d at 1494.
 
 
 26
 Second, Balcor argues that recently proposed congressional amendments that would eliminate this practice suggest that courts have misunderstood the statute. See S. 540, 103d Cong., 1st Sess. (1993); 138 Cong.Rec. S8357, S8359 (daily ed. June 17, 1992). Of course, the proposed amendments instead may mean that Congress has recognized the consequences of the present rule and decided that they should change it. The statute permits recovery from the initial transferee even though the transfer was avoidable only because it benefited the insider. The statute means what it says even if Congress has thought better of it.
 
 
 27
 Next, Balcor complains that it is "grossly unfair" to take money from the initial transferee only because it benefited an insider guarantor, especially in this case where the initial transferee was protecting other creditors through an escrow arrangement. Appellant's Br. at 27, 29. However, the courts' equitable powers do not permit them to disregard the clear language of the statute, regardless of how unfair it may seem to be. See, e.g., Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."). Section 550(a)(1) clearly permits recovery from the initial transferee if the transfer is avoidable under section 547(b). Robinson Bros., 97 B.R. at 80; Levit, 874 F.2d at 1194. Furthermore, we disagree that it is unfair. Regardless of the outsider creditor's culpability, fairness to the other creditors requires the creditor to return to the estate any payments it might not have received had they not benefited an insider. See Suffola, 2 F.3d at 980-81; Levit, 874 F.2d at 1198; cf. H.R.Rep. No. 595, 95th Cong., 1st Sess. 178 (1977), 1978 U.S.C.C.A.N. 5787, 5963, 6139 ("[A] creditor's state of mind has nothing whatsoever to do with the policy of equality of distribution, and whether or not he knows of the debtor's insolvency does little to comfort creditors similarly situated who will receive that much less from the debtor's estate as a result of the prebankruptcy transfer to the preferred creditor."). In some cases, unlike this one,[3] there may be no evidence at all that the debtor's preference of an outsider creditor was motivated by the benefit to an insider guarantor. But Congress chose to avoid transfers satisfying objective criteria that suggested a high risk of favoritism rather than requiring proof of subjective intent. Considering the likelihood of favoritism when the objective criteria are met and the difficulty of proving preferential intent, the objective approach does not seem unfair.
 
 
 28
 Finally, Balcor argues that there are actually two transfers involved--the payment to Balcor and the resulting reduction in exposure to the insiders--and only the latter is avoidable. See, e.g., In re Aerco Metals, Inc., 60 B.R. 77, 79 (Bankr.N.D.Tex.1985). Every circuit that has considered the issue has rejected this theory and allowed extended recovery. See Suffola, 2 F.3d at 981-82; C-L Cartage, 899 F.2d at 1494-95; Robinson Bros., 97 B.R. at 79-80; Levit, 874 F.2d at 1195-96. This "two-transfer" theory incorrectly defines transfer as a benefit received instead of property disposed. See 11 U.S.C. Sec. 101(54) (defining "transfer" as "disposing of or parting with property" by any means); C-L Cartage, 899 F.2d at 1495. The two-transfer theory also mistakenly assumes that benefits to creditors, rather than transfers, are avoidable. See Levit, 874 F.2d at 1195-96. The theory therefore implies that the only reason for the preference section is to punish culpable creditors, rather than to recover money that may have been unfairly paid out by the debtor. Both the text of the statute and its underlying purposes favor extending recovery from the initial transferee if the transfers preferred an insider guarantor.
 
 
 29
 We therefore AFFIRM the district court's ruling that the trustee may recover the transfers to Balcor made during the year preceding the filing of bankruptcy.
 
 
 
 [1]
 The trustee claims that Balcor earlier admitted that the loans were in default when the escrow agreements were formed and now is estopped from arguing otherwise. Because the record sufficiently indicates at least that the escrow agreement was formed because of Balcor's concerns and the debtors' delinquency, and because Sec. 547(c)(2)(C) is objective anyway, we do not address the trustee's judicial estoppel argument
 
 
 [2]
 Balcor argued for the first time in its reply brief that the documents at Tabs 8 and 9 were not admitted in evidence. After oral argument the trustee moved to supplement the record with pages 27 through 43 of the trial transcript to show that the documents were admitted. Although we could have reviewed the trial transcript in any event, we grant their motion to supplement the record and agree that the documents were admitted in evidence
 
 
 [3]
 The bankruptcy court found that the insider guarantors were very concerned about releasing their guaranties, suggesting that they had reason to favor Balcor to forestall foreclosure and reduce their exposure. Clark, No. 91-1338-SBB, slip op. at 5