**In re THOMPSON BOAT COMPANY, Debtor.**

**Randall FRANK, Trustee, Plaintiff,**

v.

**VOLVO PENTA OF THE AMERICAS, Defendant.**

Bankruptcy No. 93–20546–AJS.
Adv. No. 96–4168–R.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Aug. 29, 1996.

Henry Knier, Bay City, MI, for Plaintiff.

Scott Chernich, Lansing, MI, for Defendant.

### SUPPLEMENTAL MEMORANDUM OPINION

STEVEN W. RHODES, Bankruptcy Judge.

This opinion supplements this Court's bench decision following trial on May 22, 1996.[1] By a special stipulation of the parties in this adversary proceeding, this Court has reviewed in detail the testimony as reflected in the transcript of the trial before Judge Spector on August 4, 1995. The record should reflect, however, that this Court has not reviewed or considered the opinion previously entered by Judge Spector following the trial before him, or the decision that he wrote upon a motion for reconsideration.

### I.

In this adversary proceeding, the trustee in this chapter 7 proceeding seeks recovery of alleged preferences under 11 U.S.C. § 547(b). Specifically, the trustee seeks recovery of five payments made by Thompson Boat Company to Volvo Penta of the Americas, totaling $252,830.50.

The parties have stipulated to the elements for preference recovery under 11 U.S.C. § 547(b). The parties have also stipulated to a new value defense for Volvo under 11 U.S.C. § 547(c)(4), such that the trustee's net

---

1. The United States Court of Appeals for the Sixth Circuit recently decided *Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.)* 91 F.3d 811 (6th Cir.1996), which addresses the issues raised in this matter. Because that decision was announced after this Court's bench decision of May 22, 1996, it will not be addressed in this supplemental opinion.

claim is reduced to $148,899.07, plus interest and costs.

Volvo contends that the trustee should have no recovery because the payments at issue were made in the ordinary course of business under 11 U.S.C. § 547(c)(2).

In reply, the trustee asserts that while the payments were on a debt incurred in the ordinary course of business under 11 U.S.C. § 547(c)(2)(A), the payments were not in the ordinary course of the business of Thompson and Volvo under subpart (b), and the payments were not pursuant to ordinary business terms under subpart (c).

11 U.S.C. § 547(c)(2) provides in pertinent part:

> (c) The trustee may not avoid under this section a transfer—
>
> . . . .
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms[.]

■ There are two issues before the Court. First, were the payments in the ordinary course of the business of Thompson and Volvo? Second, were the payments made pursuant to ordinary business terms? Volvo bears the burden of proof on these two elements of its affirmative defense under 11 U.S.C. § 547(g), and that burden of proof is by a preponderance of the evidence.

## II.

The first issue is whether the payments were made in the ordinary course of business between Thompson and Volvo.

### A.

The parties have stipulated to extensive facts that pertain to this issue. During all relevant times, part of Thompson's ordinary business was the building of stern-drive pow-

ered water craft, and Volvo was in the business of manufacturing and supplying boat companies with stern-drive engines, parts and accessories for those engines. The parties have stipulated that the industry in which Volvo operates includes stern-drive engine manufacturers, and that Volvo had a continuous business relationship with Thompson dating back to 1982, whereby Volvo supplied Thompson with stern-drive engines, parts and accessories for those engines. The date of Volvo's last shipment of products to Thompson was May 11, 1993. The parties have stipulated to an extensive chart of all of the transactions between Volvo and Thompson from May 4, 1992 through May 11, 1993.

The average age of Volvo invoices paid by Thompson during the 90-day period immediately preceding the filing of the petition was 79 days, as calculated from the invoice date to the date of receipt. Thompson paid 31 Volvo invoices during the 90-day period immediately preceding the filing of the petition. The average age of the Volvo invoices paid by Thompson during the seven-month period immediately preceding the 90-day preference period was 70 days, as calculated from the invoice date to the date of receipt. Thompson paid 34 invoices during the seven-month period immediately preceding the 90-day preference period.

The earliest Thompson paid a Volvo invoice during the preference period was 26 days after issuance, which payment relates to invoice number 11743, in the amount of $1,529.90. The oldest Volvo invoice that was paid by Thompson during the preference period was 126 days, which was invoice number 23738, in the amount of $10.55. During the seven-month period preceding the preference period, the earliest Thompson paid an invoice was 35 days after issuance, relating to invoice number 323679, in the amount of $42,638. During that time period, the oldest outstanding invoice paid by Thompson was 84 days after issuance, invoice number 34333, in the amount of $539.48.

The Court further concludes that the proposed findings of fact offered by the trustee on pages 5–8 in his trial brief filed on May 15, 1996 are supported by the evidence, and the Court will find those facts.

Volvo's invoice terms were net 34 days for engine invoices and 10th of the following month for parts invoices. Each of the preferential payments were made beyond the invoice terms. Thompson was a slow payer of its account with Volvo, and indeed Volvo's witness, Mr. Archambeau, testified that Thompson was an extremely slow payer.

The preferential payments in the amounts of $88,916.30, $94,843.73, and $58,930.40 were explicit prerequisites to lesser value shipments by Volvo of engines and parts that had been ordered by Thompson. These shipments were then made immediately after receipt of these payments by Volvo.

On the dates following the three payments identified earlier, Volvo shipped substantially lower value goods than the amount that the payments required as a prerequisite. The shipments, as compared to the payments, are: following the payment of almost $89,000, Volvo shipped product invoicing $54,561.45; following the payment by Thompson of almost $95,000, Volvo shipped product invoicing $57,431.75; and then following payment by Thompson of almost $59,000, Volvo shipped product invoicing $41,125.95.

The evidence further establishes that during the preference period, Volvo improved its position and reduced its outstanding exposure from Thompson by $85,584.68.

While Gerald White was the credit manager for Volvo, until he retired in 1991, the credit limit was between $100,000 and $125,-000, which was essentially the value of one truckload of engines. After Mr. White retired, Mr. Archambeau became the credit manager and he reduced the credit limit for Thompson from the $150,000 credit limit, which was applicable in latter 1992, to $50,-000 as of February 1993. That reduction reduced the credit limit to an amount below necessary to purchase a truckload of engines.

Mr. Archambeau did this in order to make Thompson realize that Volvo was serious about getting paid quicker and according to contract and invoice terms. Mr. Archambeau reduced the credit limit so that every new order from Thompson would be subject to his specific approval and further negotiations for additional payments by Thompson.

Indeed, he personally reviewed each sale to Thompson during the preference period.

As a result of Mr. Archambeau's conduct just prior to and during the preference period, Thompson, and specifically Mr. Anderson, believed that Volvo was indeed trying to reduce the period for payment by Thompson to the contractual term of 30 days.

Mr. Archambeau's conduct in attempting to collect on the debt from Thompson was a substantial change in the collection practices of Mr. White before his retirement. Mr. Archambeau's collection practices essentially constituted a new policy on his part pursuant to which only payment according to contract terms would be acceptable. If Thompson were taking more than the time period allowed under the contract terms, that was unacceptable to him.

Mr. Archambeau's new policy caused manufacturing delays at Thompson's facility. As a result of those manufacturing delays, there were delays in sales by Thompson, which directly and adversely impacted its cash flow, and made it even more difficult for Thompson to pay all of its debts, including its debts to Volvo.

Mr. Anderson further testified that after Mr. Archambeau became the credit manager, there were several occasions on which there were missing parts and accessories in its engine shipments which caused further negotiations on the payments of further debt by Thompson.

Volvo's internal memoranda regarding Thompson's account and correspondence from Volvo to Thompson during the preference period indicates that Volvo was trying to get all past due items paid, that Volvo was unwilling to release any new product until all past due items were paid, that payments later than the net 30 terms were unacceptable, and that service interruptions would occur until all past due items were paid in full.

The evidence also establishes that the period of time between invoice date and payment date was not consistent during the preference period. Most significantly, the evidence establishes that the collection practices of Mr. Archambeau resulted in a continual decrease of the outstanding credit balance from

a high of $241,7426.41 in December of 1992, to $115,920.22 at the time of the filing of the bankruptcy.

### B.

Based on these facts, Volvo contends that the timing of the late payments during the preference period was consistent with the timing of the late payments during the seven months before the preference period. Therefore, Volvo argues, the Court should find that these late payments were normal and ordinary and in the ordinary course of business. Volvo further argues that even if there was extra pressure during and just prior to the preference period, that extra pressure did not have the effect of speeding payments to Volvo in any significant way and therefore, should not be given any consideration in determining whether these payments were in the ordinary course of business.

The trustee contends that pursuant to Mr. Archambeau's plan, Volvo took extraordinary measures to get Thompson to pay on a consistent basis within 30 days of invoice terms. The trustee further argues that even if the timing of Thompson's payments to Volvo was not reduced, it is certainly true that the amount of the debt was substantially reduced. Thus, the trustee contends that the ordinary course of business as reflected in the conduct of the parties, especially Mr. Archambeau, was payment pursuant to contract terms, and that payment beyond the terms was not acceptable to Volvo.

### C.

The phrase "ordinary course of business" is not defined in the Bankruptcy Code. There is a wealth of cases defining and applying that phrase in 11 U.S.C. § 547(c)(2)(B). In *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739 (6th Cir.1989), the court reviewed the legislative history of this provision in order to give it some application in that case. The court stated, "However, subsequent case law is in agreement that this section was intended to 'protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee.'" *Fulghum Constr.*

*Corp.*, 872 F.2d at 743 (*quoting In re Energy Co-op, Inc.*, 832 F.2d 997, 1004 (7th Cir. 1987)). The court further stated, "Congress enacted § 547(c)(2) 'to leave undisturbed normal financial relations, because they do not detract from the general policy of the preference section to discourage unusual action by either the debtor or creditors during the debtor's slide into bankruptcy.'" *Id.* at 743 (*quoting In re Advance Glove Mfg. Co.*, 761 F.2d 249, 251 (6th Cir.1985)). The court continued, stating, "Despite the foregoing standards, there is no precise legal test which can be applied; rather, this court must engage in a 'peculiarly factual' analysis." *Id.* at 743 (*citing In re First Software Corp.*, 81 B.R. 211, 213 (Bankr.D.Mass.1988)).

Subsequently, in *Yurika Foods Corp. v. UPS (In re Yurika Foods Corp.)*, 888 F.2d 42 (6th Cir.1989) the court stated, "Normally, if late payments were the standard course of dealing between the parties, they shall be considered as within the ordinary course of business under section 547(c)(2)." *Yurika Foods Corp.*, 888 F.2d at 44 (*citing In re Fulghum Constr. Corp.*, 872 F.2d at 743). The court further indicated:

> In considering which transactions are ordinary, courts examine several factors, including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made.
>
> . . . .
>
> The bankruptcy court determined that late payments were the ordinary practice between the debtor (Yurika) and the creditor (UPS). The court indicated that 87% of Yurika's payments were made after the period specified in the bills, and more than half after twice the period of seven days specified.

*Id.* at 45. The court held that "substantial evidence supports the lower courts' finding that late payments were the ordinary course of dealing between the parties." *Id.*

More recently, in the case of *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239 (6th Cir.1992), the court stated:

With respect to subsection (B), the subjective component, the courts generally eschew precise legal tests and instead engage in a fact-specific analysis. In doing so, they examine several factors, "including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made." Late payment of a debt has been considered particularly important in determining whether the payment is ordinary. A late payment will be considered "ordinary" only upon a showing that late payments were the normal course of business between the parties.

*Fred Hawes Org., Inc.*, 957 F.2d at 244 (citations omitted). In that case, the court held that late payments were not ordinary because they were outside of the contract term. *Id.* at 245.

Volvo cited *Transue & Williams Stamping Co. v. Cleveland Screw Prod. Inc. (In re Transue & Williams Stamping Co.)*, No. 95–6044, 1995 WL 646834 (Bankr.N.D.Ohio Sept. 19, 1995). In that decision, the court stated:

> The court also finds that the second prong of the ordinary course defense is satisfied. Over their 27 year relationship, the Plaintiff and the Defendant established a course of dealing under which the Plaintiff paid the Defendant's invoices approximately 90 days after the invoice date. The transfers at issue in this matter ranged from 72 to 99 days after the related invoice date. There is no evidence presented that the Defendant knew that the Plaintiff was in financial trouble or took advantage of that knowledge. In addition, there is no indication that the Defendant increased its collection efforts during the preference period. Finally, the amounts paid were consistent with the history of payments between the parties. Accordingly, the court finds that the transfers at issue were made in the ordinary course of business of the Plaintiff and the Defendant.

*Transue & Williams Stamping Co.*, No. 95–6044, 1995 WL 646834, at *2 (Bankr. N.D.Ohio 1995) (*citing Yurika Foods* and *Fulghum Constr.*).

In *Hertzberg v. American Elec. Contractors (In re Steel Improvement Co.)*, 79 B.R. 681 (Bankr.E.D.Mich.1987), this Court stated:

> In each of these three adversary proceedings, the evidence overwhelmingly indicates that the manner and timing of the late payments at issue were consistent with the manner and timing of other payments made by the debtor to the defendants. The evidence indicates that the debtor regularly paid at least these three creditors late, and none of these creditors undertook any specific action to collect its debt from the debtor.

*Steel Improvement Co.*, 79 B.R. at 685.

Finally, in the case of *XTRA, Inc. v. Seawinds Ltd. (In re Seawinds Ltd.)*, 888 F.2d 640 (9th Cir.1989), the court disallowed the ordinary course of business defense primarily because of the economic pressure exerted by the defendant in obtaining payments from the debtor.

### D.

In this case, the Court concludes that Volvo failed to establish by a preponderance of the evidence that the payments made to it by Thompson during the preference period were in the ordinary course of business. The evidence establishes that both Volvo and Thompson considered Thompson's late payments acceptable and in the ordinary course of business during the many years while Mr. White was the credit manager of Volvo. However, when Mr. Archambeau became the credit manager in late 1991, he decided that it was necessary to reduce Thompson's debt, and to get Thompson to comply with the invoice and contract terms. Thereupon he employed extraordinary and largely unprecedented action to get the Thompson debt reduced, and indeed he was extremely successful in his efforts.

There is some evidence that Volvo had on occasion in prior years refused to ship goods pending a payment. However, that evidence does not suggest the same level of economic pressure that Mr. Archambeau exerted just prior to and during the preference period. Indeed, the evidence establishes that if Mr. Archambeau had been permitted to continue with his plan, the Thompson debt would have

been reduced to zero, and Thompson would have paid according to ordinary business terms and invoice terms, but the bankruptcy intervened.

The ordinary course of business that Mr. Archambeau wanted was contract terms. In his view, everything that he did and all the payments that Thompson made were in the ordinary course of his business. The Court concludes that Mr. Archambeau's testimony was problematic. The problem was not that his testimony was self-serving, but rather that everything a credit manager like Mr. Archambeau does is for the purpose of collecting a debt. This includes sending the bill, sending a follow-up reminder letter, making a follow-up reminder phone call and filing suit. He does what he has to do to collect debts, and everything he does is in the ordinary course of the business of collecting debts.

The Court concludes, however, that the statute requires the Court to determine the issue of ordinary course of business from a perspective that is broader than the perspective of a credit manager.

The parties have not cited, and the Court has been unable to find, any cases where the kind of action taken here by Volvo was found to be in the ordinary course of business under 11 U.S.C. § 547(c)(2)(B). Certainly, there are cases in which late payments have been found to be in the ordinary course of business, but only where the defendant consistently paid late and those late payments were ordinary in the sense they were acquiesced in or accepted by the creditor.

In this case, Thompson consistently paid late, both during the several years before the preference period and during the preference period. The payments at issue here were made only because Thompson needed Volvo's engines and because Volvo insisted on large payments as a condition of shipping those engines. That pressure was largely unprecedented in the parties' relationship. Indeed, the evidence establishes that Thompson did not pay because it was pursuant to some understanding between the parties and in the ordinary course of business. Thompson paid because it had to in order to get Volvo's product.

Volvo notes, and correctly so, that its activity during the preference period did not statistically reduce the average time of outstanding invoices. Therefore, Volvo asserts the inference that the payments were made in the ordinary course of business.

However, the Court concludes that it must look at the totality of circumstances in determining whether these payments were made in the ordinary course of business, and that this one factor is not, by itself, conclusive. Other circumstances clearly establish that Thompson would have paid Volvo even later during the preference period if Volvo had not withheld shipments pending those payments.

As noted earlier, this is not a case where Thompson paid because it had established a practice of paying outside of the contract terms by implicit agreement with Volvo. Accordingly, the Court concludes that these payments were not paid in the ordinary course of business.

### III.

The second issue is whether these payments were made under ordinary business terms.

### A.

The parties have stipulated to the facts shown in a chart of the transactions between Mercury Marine and Thompson Boat between June 1, 1992, through February 15, 1993. The Court concludes that the additional proposed findings of fact asserted by the trustee are substantially supported by the evidence, and the Court will adopt these findings of fact.

During all relevant times, part of Thompson's ordinary business was the building of stern-drive powered watercraft. During all relevant times, Volvo was in the business of manufacturing and supplying boat companies with stern-drive engines, parts and accessories for those engines. The industry in which Volvo operates includes stern-drive engine manufacturers. During the relevant period, four companies were in the business of manufacturing stern-drive engines: Volvo,

MerCruiser, Outboard Marine Corporation, and Yamaha Motor Company.

According to Volvo's credit manager, Mer-Cruiser, also called Mercury Marine, held close to 90 percent of the industry at the relevant time. Volvo held most of the remaining 10 percent of the industry.

The invoice terms for MerCruiser were ½ percent 15 days, net 30 days for engines, and 15th of the following month for parts. Mer-Cruiser handled a little over 600 original equipment manufacturer accounts. Mer-Cruiser expected all of their customers to pay their accounts within invoice terms. During early 1993, approximately 80–85% of MerCruiser's original equipment manufacturers paid their bills within the invoice terms.

MerCruiser considered Thompson a problem account. Mr. Williams, a witness for MerCruiser, was unable to name any particular boat manufacturer, other than Thompson, who paid outside of the invoice terms during 1990 through 1993. No other witness testified as to the business terms of debtors and creditors in the relevant industry other than the parties during the relevant time period. The Court concludes that these findings of fact are supported in not only the trial transcript, but also the transcript of Mr. Williams' deposition.

### B.

Based on these facts, Thompson contends that payment was within the range of terms in the relevant industry, especially considering the length of the relationship between Thompson and Volvo.

The trustee contends, on the other hand, that these payments were not under ordinary business terms, which were payment within contract terms, generally 30 days for engines.

### C.

Again, there are several cases interpreting the phrase "ordinary business terms" as used in 11 U.S.C. § 547(c)(2)(C). In the *Hawes* case, the Sixth Circuit indicated that in order to determine whether payments are pursuant to ordinary business terms, the court should "analyze whether the particular transaction in question comports with the standard conduct of business within the industry." *Hawes,* 957 F.2d at 246. Accordingly, the bankruptcy court is instructed to look at what is accepted and common in the industry. Significantly, the Court notes that the *Hawes* case did not say that the court should look at what the industry does with its slow paying customers.

Volvo relies on the case of *In re Tolona Pizza Prod. Corp.,* 3 F.3d 1029 (7th Cir.1993). In that case, the specific issue before the court was the interpretation of this subpart (C) of § 547(c)(2). In defining this phrase, the court held:

> We conclude that "ordinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*Tolona Pizza,* 3 F.3d at 1033.

Volvo also relies on the even more recent case of *Fiber Lite Corp. v. Molded Acoustical Prod., Inc. (In re Molded Acoustical Prod., Inc.),* 18 F.3d 217 (3d Cir.1994). In addressing and interpreting this term, the court stated:

> We believe that the Court of Appeals for the Seventh Circuit delivered the best rendering of the text of § 547(c)(2)(C) when it held that " 'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *Tolona Pizza,* 3 F.3d at 1033. We will embellish the Seventh Circuit test, however, with a rule that subsection C countenances a greater departure from that range of terms the longer the pre-*insolvency* relationship between the debtor and creditor was solidified.

*Molded Acoustical Prod., Inc.,* 18 F.3d at 220.

However, the court stated, "We think ordinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships." *Id.* at 227 (*citing Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners)*), 12 F.3d 1549, 1553 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994)).

Volvo also relies upon the case of *Advo–System, Inc. v. Maxway Corp. (In re Maxway Corp.)*, 37 F.3d 1044 (4th Cir.1994), which adopted the *Molded Acoustical* approach, as well as the *Transue* case, which adopted and applied *Tolona Pizza* and *Molded Acoustical.*

### D.

■ This Court has no difficulty accepting the *Tolona* approach to the ordinary business terms analysis. To the extent that *Tolona* held, ordinary business terms may indeed be a range in a given industry. However, this Court must reject the argument that payments outside of this range may nevertheless be considered pursuant to ordinary business terms if the parties have a longer relationship, as suggested in *Molded Acoustical, Advo–System* and *Transue.* The Court must reject this argument for two reasons.

First, this argument was explicitly made in the *Hawes* case. The district court specifically so held but the argument was rejected by the Court of Appeals and the district court's judgment in holding to that effect was reversed.

Second, as a matter of general application, the issue of ordinary business terms, like the business of ordinary course of business generally, is a peculiarly fact-based inquiry. In some industries it may be true that ordinary business terms would allow for some deviation the longer a relationship, but in other industries, that may not be true. Accordingly, the Court will not apply that holding in this case.

This Court also rejects the holding in the case of *Jones v. United Sav. & Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.)*, 9 F.3d 680 (8th Cir.1993). In that case, the Eighth Circuit held that it is appropriate to examine how creditors in the industry face the same or similar problems, and that if such creditors work with debtors in their late payments, and that is the industry norm, then those late payments would be pursuant to ordinary business terms.

The Court rejects this holding for two reasons. First, it is inconsistent with *Hawes,* which this Court is bound to apply. Second, the holding in *U.S.A. Inns* would provide no limit to what would be ordinary business terms.

### E.

■ In this case, the evidence establishes that the ordinary business terms in the industry were invoice terms. This is the sum and substance of the testimony from Mr. Williams of MerCruiser, which held 90% of the industry.

This Court has also found that under Mr. Archambeau's practice, the ordinary course of business between Thompson and Volvo was contract terms. Given these facts and the holdings previously cited to the effect that ordinary business terms are those in healthy relationships between debtors and creditors, the Court finds that ordinary business terms in this industry are contract terms.

These payments were not made pursuant to contract terms, and thus, were not made under ordinary business terms in this industry.

### IV.

Accordingly, the Court concludes that Volvo has failed to establish by a preponderance of the evidence that these payments were made under ordinary business terms. The ordinary course of business defense of Volvo is therefore rejected, and judgment is granted in favor of the trustee.