**In re ALLIED CARRIERS' EXCHANGE, INC., Debtor.**

**Jeanne Y. Jagow, Trustee, Plaintiff–Appellee,**

v.

**Jack R. Grunwald, Defendant– Appellant.**

**BAP No. CO–07–040.**

**Bankruptcy No. 03–12392–EEB.**

**Adversary No. 04–2056–EEB.**

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Sept. 4, 2007.

---

**612**

---

Submitted on the briefs: *

Robert A. Simon and Paul J. Vitanza of Barlow Garsek & Simon, LLP, Fort Worth, TX, for Defendant–Appellant.

* The parties did not request oral argument, and after examining the briefs and appellate record, the Court has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. Bankr.P. 8012. The case is therefore ordered submitted without oral argument.

Virginia M. Dalton of Pearlman & Dalton, P.C., Denver, CO, for Plaintiff–Appellee.

Before McFEELEY, Chief Judge, NUGENT, and THURMAN, Bankruptcy Judges.

McFEELEY, Chief Judge.

Defendant/Appellant Jack R. Grunwald appeals an order of the bankruptcy court of the District of Colorado contending that the bankruptcy court erred under 11 U.S.C. § 547(b) when it concluded that Grunwald had received a preference because the Debtor, Allied Carriers Exchange, Inc., was not insolvent during the period in question. Grunwald also argues that the bankruptcy court erred when it rejected his affirmative defense under 11 U.S.C. § 547(c)(2) that all transactions within the preference period were within the ordinary course of business. For the following reasons, we affirm.

## I. Background

A non-profit corporation formed in the mid–1950s, Allied Carriers Exchange, Inc. ("Allied") was a business comprised of members that provided transportation and freight shipping services to third parties. The members factored accounts receivable, which they then sold to Allied at a discount of approximately three percent. Allied then collected the face amount of the accounts from the members' customers. All transfers were with full recourse to the factoring member and members were required to maintain deposits with the Debtor to partially secure their recourse obligation.

Allied's operations were financed through four sources: 1) lines of credit and loans from commercial banks and other financial institutions; 2) sales of commercial paper (short term unsecured notes) and demand loan "Prime Accounts"; 3) deposits securing members' recourse obligations; 4) profits. Prior to 1985, the loans from members and affiliates were represented by commercial demand notes. To relieve it from the burden of issuing new notes each time a note matured, after 1985 Allied converted the demand notes to something it called "Prime Accounts." The Prime Accounts were governed by Prime Loan Agreements. Under the Prime Loan Agreements, on written demand, members could withdraw money from their accounts at any time. The loans bore interest at the prime rate of the Debtor's primary bank lender. Members received monthly statements indicating the amount in their accounts and the accrued interest. In September 2002, there were 116 members participating in the Prime Account program. These members had cumulative deposits of more than $15.6 million.

Until September 2001, Allied operated successfully. However, due to the terrorist events on September 11 and the subsequent disruptions in commerce, Allied experienced a delay in collecting on its accounts and experienced a subsequent overdraft with Allied's lender banks ("Bank").[1] Subsequently, the Bank imposed stricter controls and requirements for borrowing.

Sometime late in 2001, Allied began to suspect that it had purchased fraudulent accounts from one of its members, Air Trans. The problem with the Air Trans accounts was first suspected when Allied learned of a dispute between Air Trans and Samsung, one of Air Trans' customers. By spring of 2002, Allied discontinued pur-

---

**1.** Allied had loans from three banks: Wells Fargo, Bank One, and U.S. Bank. Wells Fargo was the lead bank. By April 2002, the loans were secured by all of Allied's assets.

chasing accounts from Air Trans. Between March 2002 and August 2002, Debtor was unable to collect any of the Air Trans accounts, then totaling between eleven and twelve million dollars.

During that period, the Acme Group, a freight transportation business and a member of Allied, was asked by Allied's president, Gary Rynearson, if they would be interested in purchasing Allied's assets. Members of the Acme Group included Grunwald, Grunwald's father, Jack L.K. Grunwald, and Acme Distribution. Acme Distribution's chief operating officer was Jeff Goldfogel. In March 2002, Goldfogel began attending Allied's board meetings. On March 19, 2002, Goldfogel wrote a letter to the Acme Group indicating that the Air Trans receivable of approximately twelve million dollars was probably gone.

In September 2002, Allied discovered that another of its members, Magnum International, had sold it twenty million dollars in fraudulent freight bill accounts. Subsequently, Allied ceased doing business.

An involuntary petition for relief under Chapter 7 was filed against Allied on February 14, 2003. An Order for Relief under Chapter 7 was entered on March 17, 2003. Jeanne Y. Jagow ("Trustee") was appointed as the Trustee of Allied's estate.

Since 1993, Grunwald was a member and had a Prime Account with Allied. By an agreement entered into in 1998, Grunwald agreed to maintain a balance in his Prime Account of approximately $2.5 million.[2] Prior to 2000, Grunwald frequently withdrew funds from his Prime Account. On November 23, 1999, Grunwald entered into an agreement with Allied whereby Allied sent Grunwald all accrued interest on his account each month. In 2002, within a year prior to the filing of the petition, the following seven interest payments were made:

| Date | Amount |
|------|--------|
| 3.01.02 | $10,965.42 |
| 4.01.02 | $12,054.56 |
| 5.01.02 | $11,456.81 |
| 6.03.02 | $11,657.00 |
| 7.01.02 | $11,068.66 |
| 8.01.02 | $11,435.09 |
| 9.01.02 | $11,435.14 |

From 1999 until 2002, Grunwald did not make any principal withdrawals. In 2002, Grunwald made the following two principal withdrawals from his Prime Account:

| Date | Amount |
|------|--------|
| 3.22.02 | $ 75,000.00 |
| 5.17.02 | $100,000.00 |

In all, approximately $255,072.68 was transferred to Grunwald from his Prime Account. On September 21, 2004, Jagow made demand on Grunwald for return of both the interest and principal transfers as preferences. Grunwald objected, arguing that Allied had not been insolvent at the time of the transfers and alternatively, asserting the affirmative defense that the transfers were made in the ordinary course of business.

The Trustee's adversary proceeding was heard over several days in 2006. Prior to the hearing, the parties stipulated that all preference elements under § 547(b) other than insolvency had been established. At the hearing, the Trustee presented an expert witness certified in assessing the value of businesses to support her contention that Allied was insolvent at the time in question. Grunwald presented two expert

---

**2.** Grunwald signed a new Prime Loan Agreement with Allied on March 1, 1998. By letter dated November 23, 1998, he agreed to maintain $2.5 million in the Prime Account at issue. Although not relevant to this appeal, Grunwald also participated in another account entitled the Grunwald Family Partnership, which contained approximately $500,000.

witnesses to support his contention that the Prime Accounts were like bank accounts and the transfers were within the ordinary course of business.

On February 16, 2007, the bankruptcy court entered its order finding in favor of the Trustee. This appeal timely followed. The parties have consented to this Court's jurisdiction because they did not elect to have the appeal heard by the United States District Court for the District of Colorado. 28 U.S.C. § 158(c)(1); Fed. R. Bankr.P. 8001; 10th Cir. BAP L.R. 8001–1.

## II. Discussion

Grunwald argues that the bankruptcy court erred when it found that the Debtor was insolvent between one year and ninety days prior to the filing of the petition and so did not meet the criteria of § 547(b)(4)(B). Alternatively, Grunwald argues that he established all elements of the affirmative defense of ordinary course of business found in § 547(c)(2).

■■■ The Trustee may avoid a transfer of property as a preference if it meets the criteria of § 547(b). Under § 547(b), the Trustee has the burden of proving that a transaction is avoidable. The bankruptcy court's determination that a debtor was insolvent at the time of the transfers is a factual finding subject to the "clearly erroneous" standard of review. *In re Mama D'Angelo, Inc.*, 55 F.3d 552, 555 (10th Cir. 1995).

■■ The bankruptcy court concluded that Allied was insolvent under § 547(b) during the period in question. The bankruptcy court found that Allied's management was aware of a problem with the Air Trans accounts by at least March 11, 2002. The bankruptcy court further concluded

that while Allied's balance sheets for the dates in questions showed that Allied valued its assets at $58.1 million against liabilities of $50.6 million, reflecting a solvency of about $7.5 million, the uncollectible Air Trans accounts were not accurately reflected on the balance sheets. The bankruptcy court concluded that a discount rate should be applied to the face value of the assets.

Three discounted amounts were discussed by the bankruptcy court: $9.9 million presented by the expert witness; $10 million presented by Allied to Acme; and the $12 million dollar discount suggested by Goldfogel. The court observed that any discount in excess of $8 million would render Allied insolvent. The court rejected the discount figure of $9.9 million offered by the expert because it did not find his methodology persuasive. The other two discounted amounts were rejected as being too high. Without stating how it arrived at this figure, the court concluded that at least a $9 million dollar discount was appropriate.

Grunwald argues that the bankruptcy court erred because it "plucked" the "$9 million figure [ ] from the air." Appellant's Amended Br. at 24. While it is unclear how the bankruptcy court derived this figure, we cannot say that there is anything in the record indicating the $9 million dollar figure is clearly erroneous because it should be lower. If anything, the evidence in the record supports a higher figure.

■■ Alternatively, Grunwald argues that the bankruptcy court erred in not accepting his ordinary course of business defense. The "ordinary course" of business exception in § 547(c)(2) is an affirmative defense to an avoidance procedure.[3]

---

3. The bankruptcy court correctly noted that

because this case was commenced prior to

*Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners)*, 12 F.3d 1549, 1553 (10th Cir.1993). It provides that the trustee may not avoid a preferential transfer:

> (2) to the extent that such transfer was—
>
>> (A) in payment of a debt·incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>>
>> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>>
>> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2)(A)-(C). The Trustee does not dispute that the transfers meet the requirements of § 547(c)(2)(A). Only subsections (B) and (C) are at issue. The Tenth Circuit has held that the ordinary course of business exception contains a subjective test in subsection (B) and an objective test in subsection (C). *Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.)*, 220 B.R. 1005, 1020 (10th Cir. BAP 1998). The subjective test examines whether the transfers at issue were "ordinary as between the parties" and the objective test examines whether the transfers were "ordinary in the industry" or under "ordinary business terms." *Id.* at 1020–21.

▆▆▆ The creditor has the burden of establishing each of these elements by a preponderance of the evidence. *See* 11 U.S.C. § 547(g); *Meridith Hoffman*, 12 F.3d at 1553. This defense is narrowly construed. *Sunset Sales*, 220 B.R. at 1020. (quoting *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1339 (10th Cir.1996)). Failure to meet any of the

three requirements in § 547(c)(2) results in a denial of the defense. *Meridith Hoffman*, 12 F.3d at 1553. The bankruptcy court's determination that the transaction at issue fell within the ordinary course of business exception of § 547(c)(2) is a question of fact, reversible only if clearly erroneous. *See Sunset Sales*, 220 B.R. at 1020.

Because there are two types of transfers at issue, interest and principal, we will address them individually.

### The Principal Payments

▆▆▆ The bankruptcy court found that the principal payments did not meet the subjective test of § 547(c)(2)(B). The Tenth Circuit has indicated that courts must consider the four following factors by comparing pre-preference period transfers with preference period transfers to determine if the transactions meet the criteria of the subjective test: (1) the length of time the parties were engaged in the transaction at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; (4) the circumstances under which payment was made. *Sunset Sales, Inc.*, 220 B.R. at 1020–21. The court found that the two principal payments could not meet the criteria of this test for the following reasons: no principal withdrawal had been made for over two years previous to the request in March; the withdrawal in March occurred two weeks after the meeting where Grunwald discovered that Allied had financial difficulties; the withdrawal in May occurred when the Acme Group was receiving more information about Allied's difficulties. The bankruptcy court further found that the

---

BAPCPA, the 2005 amendments do not apply. Under the 2005 amendments, Grunwald would have had to demonstrate either the subjective test or the objective test for the

defense to apply. However, under the statute in effect prior to the BAPCPA amendments, both prongs must be met.

evidence indicated that Grunwald had doubts about the safety of his investment in the Prime Account and was attempting to alleviate potential loss. Finally, the bankruptcy court concluded that withdrawal of principal from Prime Accounts was unusual activity from Allied's standpoint as only one other Prime Account holder requested a withdrawal during that period.

Grunwald argues that the bankruptcy court erred on this issue because he had withdrawn funds from his Prime Account in the past and his agreement provided for such withdrawal. While both of these statements are true, they do not in and of themselves rebut the bankruptcy court's findings. More importantly, Grunwald points to nothing in the record indicating that the bankruptcy court erred when it concluded that Grunwald knew about the precariousness of Allied's financial situation and therefore, the circumstance under which the transfers were made were suspicious. We see no error in the bankruptcy court's conclusions.

### The Interest Payments

■ The bankruptcy court found that the interest payments met the subjective test but did not meet the objective test. The objective test focuses on whether the transfers were made under ordinary business terms. 11 U.S.C. § 547(c)(2)(C). The Tenth Circuit has stated that the term "ordinary business terms" means terms that are used in usual or ordinary situations. *Meridith Hoffman,* 12 F.3d at 1553. (Observing that "[t]he purpose of the ordinary course exception is 'to leave undisturbed normal financing relations ....'" (quoting S.Rep. No. 989, at.88 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874)). The Court stated "[o]rdinary business terms therefore are those used in 'normal financing relations'; the kinds of terms that creditors and debtors use in ordinary

circumstances, when debtors are healthy." *Id.*

■ The bankruptcy court concluded that demand deposit accounts at banks were not similar enough to Allied's Prime Accounts to accord substantial weight to the expert's testimony. Because Grunwald did not demonstrate standards for interest payment for similar accounts in the factoring industry, the bankruptcy court found that it could not meet the objective test. The court further concluded that Grunwald presented no evidence that it was usual for a bank to pay monthly accumulated interest by check to a depositor.

Grunwald argues that his evidence met the criteria of the objective test. He states that "the payment of a debt instrument according to its terms without acceleration of maturity or reduction of the pay off amount, is payment according to ordinary business terms." Appellant's Amended Br. at 29. While this statement may be true, there is nothing in the record indicating that Grunwald proffered evidence that the Prime Account or Prime Loan Agreement were debt instruments or that the interest payments were repayments of a debt. We conclude that this argument is not properly before us because with this new argument, Grunwald is raising a fact-based challenge that was not adequately raised or decided below. *Okla. Chapter of the Am. Acad. of Pediatrics v. Fogarty,* 472 F.3d 1208, 1216 (10th Cir. 2007), *petition for cert. filed,* 75 U.S.L.W. 3622 (U.S. May 7, 2007) (No. 06–1482).

At trial, Grunwald's ordinary course of business defense rested on the premise that the Prime Accounts were like bank accounts subject to deposits and withdrawals. The bankruptcy court found that the Prime Accounts were not like bank accounts. Appellant argues that the bankruptcy court erred because it should have

looked beyond that direct evidence and considered "common knowledge of real world business practice." Appellant's Amended Br. at 30. This argument is specious. It is not the trial court's duty to provide evidence. Moreover, the trial court found that the Appellant had not met his burden of showing what types of loan payments are customary in the factoring industry or in any business similar to Allied's. We see no error in the trial court's conclusions.

## III. *Conclusion*

For the reasons set forth above, the bankruptcy court is affirmed.