In the Matter of SOUTHMARK CORPORATION, Debtor.

SOUTHMARK CORPORATION, Appellant,

v.

SCHULTE ROTH & ZABEL, Appellee.

No. 95–10872.

United States Court of Appeals, Fifth Circuit.

July 2, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 1, 1996.

Lawrence Chek, Jenkens and Gilchrist, Dallas, TX, for Appellant.

Judith R. Elkin, Robin E Phelan, Haynes & Boone, Dallas, TX, for Appellee.

Before POLITZ, Chief Judge, and WIENER and BARKSDALE, Circuit Judges.

WIENER, Circuit Judge:

In a settlement agreement entered into prior to filing for bankruptcy, Southmark agreed to reimburse a group of dissatisfied, minority-interest shareholders for expenses incurred in connection with their proxy contest and related lawsuits. Southmark now appeals the bankruptcy court's ruling that this transfer was not "for or on account of an antecedent debt owed by the debtor before such transfer was made" and thus not a preferential transfer under 11 U.S.C. § 547. Southmark also appeals the bankruptcy court's denial of its leave to file a second amended complaint. Finding reversible error in the bankruptcy court's determination that attorneys' fees and costs were not antecedent debts, we reverse and remand.

## I.

### FACTS AND PROCEEDINGS

This bankruptcy case has its roots in a proxy contest waged by a group of dissatisfied, minority-interest shareholders of Southmark known as the Parks Group. The Parks Group comprised Defendants–Appellees R & P Ventures (R & P) and Garson L. Rice, Sr., as well as former defendants Herbert B. Parks and Byron Investments, Inc. (Byron).[1] Defendant–Appellee Schulte Roth & Zabel

---

1. These two former defendants were non-suited after each filed for bankruptcy.

(SR & Z) is a law firm, which was retained to represent the Parks Group.[2]

In March 1989, the Parks Group disclosed to the Securities and Exchange Commission (SEC) an intention to propose nominees for election to Southmark's board of directors. In April, the group publicly announced its intention to wage a proxy contest for control of Southmark. Soon thereafter the Parks Group disseminated several statements in opposition to the then-current board of directors, expressing dissatisfaction with a number of matters, such as corporate governance and executive compensation. In these solicitation materials, the Parks Group also indicated that, to the extent legally permissible, it intended to seek reimbursement of the costs and expenses incurred in connection with the proxy contest.

Between February and May 1989, the Parks Group initiated three actions in state and federal courts in connection with the proxy contest, and Southmark initiated two actions in state and federal courts (collectively, the Lawsuits). Through its claims and counterclaims in the Lawsuits, the Parks Group sought (1) equitable and injunctive relief which included the right to examine Southmark's record of shareholders, and (2) judgments (a) blocking the implementation of, and declaring null and void, a Southmark anti-takeover "poison pill" provision, (b) prohibiting the Southmark directors from soliciting proxies unless specified disclosures were made, (c) directing the Southmark directors to cure deficiencies in their proxy statement, and (d) forcing Southmark and its directors to refrain from postponing a scheduled shareholders' meeting.[3] In two of its actions as plaintiff and in one of its counterclaims as defendant, the Parks Group requested that it be awarded costs and disbursements, including reasonable attorneys' fees, incurred in these Lawsuits.[4]

On May 24, 1989, a comprehensive settlement agreement (Agreement) was reached with respect to the proxy contest and all of its sub-plots. In addition to, among other things, ending the proxy contest and the Lawsuits and giving the Parks Group a voice on the Southmark board of directors, the Agreement also required Southmark to reimburse the Parks Group for all expenses, including the attorneys' fees, incurred in connection with the proxy contest and the Lawsuits. The parties estimated these expenses to be $3.3 million.

At 1:00 p.m. on that same day—approximately four hours before the Agreement was formally executed—Southmark transferred the $3.3 million to SR & Z by wire. In this instance, SR & Z was acting essentially as an escrow agent. It was under instructions to return these funds to Southmark in the event that the Agreement did not get executed. But the Agreement was formally executed by about 5:00 p.m. that day, so the following morning SR & Z transferred all of these funds to R & P by wire. R & P in turn transferred almost all of the money to Byron, who, later that same day, issued a check payable to SR & Z for $1 million.[5]

On July 14, 1989—less than 90 days after the $3.3 million transfer, and thus within the preferential transfer window—Southmark filed for bankruptcy under Chapter 11. Southmark's plan of reorganization became effective on August 10, 1990. It specifies, inter alia, that reorganized Southmark is the representative of the Chapter 11 bankruptcy

---

2. Prior to our hearing oral argument in this appeal, Southmark settled with R & P and Rice, leaving SR & Z as the only defendant.

3. In one of its actions, the Parks Group also sought monetary damages in connection with a threatened cancellation of a scheduled shareholders' meeting. This monetary relief was sought only against the Southmark directors personally, however, not against Southmark. Southmark's by-laws provide that its directors are to be indemnified to the extent permissible under Georgia law.

4. *See O'Neill v. Church's Fried Chicken, Inc.,* 910 F.2d 263, 265–66 (5th Cir.1990) (describing the common law rule that allows shareholders to recover their attorneys' fees from the corporation if they show that they have conferred a substantial benefit to the corporation as a result of their efforts). This case, however, was a stockholder's derivative action; the instant case is not.

5. As the district court found no preference, the amount that Southmark actually could recover from SR & Z alone, assuming that the $3.3 million transfer is a preference, is not at issue in this appeal.

estate for purposes of pursuing causes of action, such as the instant one, under the bankruptcy code.

On June 19, 1991, Southmark filed the original complaint in the action underlying this appeal. The members of the Parks Group were made defendants, and Southmark sought, among other things, recovery of the $3.3 million transfer as a preference under 11 U.S.C. § 547. A first amended complaint was filed on July 12, 1991.

Approximately one month later, on August 19, 1991, Rice and R & P filed their answers, denying that the transfers were preferences and asserting affirmative defenses under § 547(c). To pursue settlement, however, SR & Z obtained from Southmark several extensions of time within which to file its answer. As a result, eight additional months passed before SR & Z filed its answer on April 21, 1992.

On June 16, 1992, Southmark filed a motion for leave to file a second amended complaint for the purpose of making five amendments, three of which are now moot. The two amendments that are not moot sought (1) to identify the Southmark directors, sued for money damages by the Parks Group as creditors of Southmark, for whose benefit the preferential transfers were made; and (2) to add an alternative basis for recovery of the $3.3 million, i.e., that it was a *fraudulent* transfer under 11 U.S.C. § 548. Following oral argument on this motion, the bankruptcy court denied Southmark leave to amend its complaint.

Later, in April 1993, the bankruptcy court ruled on both Southmark's and the Parks Group's motions for summary judgment with respect to the preferential transfer issue. In its order, the bankruptcy court granted in part Southmark's motion for summary judgment with respect to many of the required

elements under § 547. Ultimately, however, the bankruptcy court ruled in favor of the Parks Group, concluding that the $3.3 million transfer of the settlement funds was not "made for or on account of an antecedent debt owed by the debtor before such transfer was made" as required under § 547(b)(2), and thus was not a preferential transfer.

The district court affirmed both the bankruptcy court's denial of Southmark's motion for leave to amend its complaint and that court's ruling that the $3.3 million was not recoverable as a preference. Southmark now appeals both of these issues to us.

## II.

### ANALYSIS

#### A. STANDARD OF REVIEW

We review a bankruptcy court's denial of a motion for leave to amend a complaint under an abuse of discretion standard.[6] We review a bankruptcy court's grant of summary judgment de novo.[7] All fact questions are viewed in the light most favorable to the non-movant. Summary judgment is proper when no issue of material fact exists and the moving party is entitled to judgment as a matter of law.[8]

#### B. DENIAL OF MOTION FOR LEAVE TO AMEND COMPLAINT

Federal Rule of Civil Procedure 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires." Although Rule 15 "evinces a bias in favor of granting leave to amend,"[9] it is not automatic.[10] A decision to grant leave is within the discretion of the trial court.[11] Its discretion, however, is not broad enough to permit denial if the court lacks a substantial reason to do so.[12] In deciding whether to grant such leave, the court may consider

6. *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir.1993).

7. *In re Omni Video, Inc.*, 60 F.3d 230, 231 (5th Cir.1995).

8. *Id.;* FED.R.CIV.P. 56(c).

9. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir.1981).

10. *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir.1993).

11. *Louisiana v. Litton Mortgage Co.*, 50 F.3d 1298, 1302–03 (5th Cir.1995).

12. *Id.*

such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment.[13]

The reasons stated by the bankruptcy court for denying Southmark's leave to amend its complaint were unreasonable delay and prejudice. Specifically, the bankruptcy court concluded that the transactions on which the proposed amendments were based were known to Southmark both at the time its plan was confirmed and at the time its original and first amended complaints were filed. The bankruptcy court also noted that before filing its original complaint, Southmark had the benefit of an Examiner's Report which analyzed causes of actions that Southmark may possibly have, including this one. Further, the bankruptcy court concluded that the fact that Southmark's bankruptcy is large and complicated does not justify delay.

■ Finally, the bankruptcy court determined that prejudice would result to R & P and Rice [14] from the addition of a fraudulent transfer claim under 11 U.S.C. § 548, as these two defendants had stipulated to Southmark's insolvency with respect to the § 547 preference claim. Although the debtor's insolvency at the time of transfer is an element of both § 547 and § 548, § 547(g) contains a presumption of insolvency whereas § 548 does not. The bankruptcy court did not find that prejudice would result with respect to any of the other amendments sought to be made by Southmark.

The district court concluded that the reasons articulated by the bankruptcy court were sufficient and affirmed the denial of leave to amend.

In arguing that the bankruptcy court abused its discretion in denying leave to amend its complaint for a second time, Southmark contends that delay alone—as distinguished from "undue" delay—cannot justify this denial.[15] Southmark further argues that its knowledge of the transactions underlying the amendments prior to the time that the adversary proceeding was commenced is an insufficient basis for denying leave to amend.[16] The delay in this case was not "undue," insists Southmark, because at the time the Motion to Amend was filed (1) no trial date had been set, (2) the only party that had commenced discovery was Southmark, (3) SR & Z had filed its answer only about two months earlier, in April 1992, following a nine month "hiatus" during which the parties discussed settlement, and (4) no dispositive motions had been filed by any party. Southmark thus argues that the instant case is distinguishable from a number of other cases in which the denial of leave to amend a complaint has been affirmed, noting that those other cases involved attempts to amend closer to the eve of trial or after dispositive motions had been filed.[17]

■ We are unpersuaded by Southmark's arguments. That many cases in which a denial of leave to amend a complaint has been affirmed involved proposed amendments closer to the eve of trial does not preclude a district court from properly exercising its discretion to deny leave to amend under particular facts like those present in the instant case. "Liberality in pleading does not bestow on a litigant the privilege of neglecting her case for a long period of

13. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir.1993).

14. Recall that prior to our hearing oral argument in this appeal, Southmark settled with R & P and Rice.

15. *See Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 599 (5th Cir.1981).

16. *See Carson v. Polley*, 689 F.2d 562, 584 (5th Cir.1982) ("A litigant's failure to assert a claim as soon as he could have is properly a factor to

be considered in deciding whether to grant leave to amend. Merely because a claim was not presented as promptly as possible, however, does not vest the district court with authority to punish the litigant.").

17. *E.g., Daves v. Payless Cashways, Inc.*, 661 F.2d 1022, 1025 (5th Cir.1981) (affirming the district court's denial of leave to amend a complaint when that amendment was filed "on the eve of trial after discovery").

time."[18] Accordingly, we have indicated that, in exercising its discretion to deny leave to amend a complaint, a trial court may properly consider (1) an "unexplained delay" following an original complaint,[19] and (2) whether the facts underlying the amended complaint were known to the party when the original complaint was filed.[20]

■ In the instant case, Southmark sought leave to add both a fact of which it had been aware since before it filed its original complaint and a cause of action based on the identical, known facts that underlie its original complaint. This motion for leave to amend was filed approximately (1) thirty-eight months after the transfer at issue was made; (2) twenty-four months after the Examiner's Report was filed, describing the details and legal implications of this transfer; (3) thirteen months after the original complaint was filed; and (4) eleven months after the first amended complaint was filed. Moreover, Southmark offers no reasonable explanation for its delay in amending its complaint.

After reviewing the record in this case, we cannot fault the bankruptcy court's discretionary determination that allowing Southmark to amend its complaint would not further the purposes of Rule 15, but to the contrary would serve only to reward Southmark for its unreasonable delay. Accordingly, we conclude that the district court did not abuse its discretion in denying Southmark's motion for leave to amend its complaint.

## C. Preferential Transfer

■ Southmark bears the burden of proving that the $3.3 million transfer in question is avoidable as a preference.[21] The element contested in this appeal is whether under § 547(b)(2) the transfer was "for or on account of an antecedent debt owed by the debtor before such transfer was made."[22] A debt is antecedent if it is incurred *before* the transfer.[23] Thus, this issue turns on whether, for purposes of the bankruptcy code, the Parks Group's demand for costs and attorneys' fees incurred in connection with its challenges to the corporate governance of Southmark constituted a "debt" prior to the execution of the Agreement. If it did, the debt would be antecedent; but if it only became a debt contemporaneously with the execution of the Agreement, it would not be antecedent.

The bankruptcy code defines the term "debt" as "liability on a claim."[24] The term "claim" is broadly defined in § 101(5) as a:

(A) Right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

(B) Right to an equitable remedy for breach of performance if such breach gives rise to a right to payment whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

The bankruptcy court here held that, unlike the claim for equitable relief itself, the Parks Group's affiliated request for costs and attorneys' fees was a "claim" because it did give rise to a right to payment in connection with the equitable relief requested. The bankruptcy court went on to hold, however, that these litigation demands were not a "debt"—even though the court acknowledged that in bankruptcy the terms "claim" and "debt" are usually synonymous.

The court reasoned that "[h]ad Southmark taken the corporate action sought by the Parks Group in the proxy contest and related Lawsuits, Southmark would have had no liability to the Parks Group for the payment of

---

**18.** *Id.* (discussing a motion for leave to amend a complaint under Rule 15(a)).

**19.** *Id.*

**20.** *Layfield v. Bill Heard Chevrolet Co.*, 607 F.2d 1097, 1098 (5th Cir.1979), *cert. denied*, 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980).

**21.** 11 U.S.C. § 547(g).

**22.** 11 U.S.C. § 547(b)(2).

**23.** *Southmark Corp. v. Marley*, 62 F.3d 104, 106 (5th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 815, 133 L.Ed.2d 760 (1996).

**24.** 11 U.S.C. § 101(12).

any costs and attorneys' fees. Therefore, in this case, no right to payment came into play and no debt was owed by Southmark to the Parks Group until the proxy contest and related Lawsuits were settled in accordance with the terms of the Settlement Agreement." Therefore, concluded the court, as the transfer in question was made prior to, or at least concurrently with, the Agreement's execution, the transfer was not made on account of an antecedent debt. The district court affirmed this holding on essentially the same reasoning, adding that the Parks Group could not have filed a suit for these costs and fees alone, but rather they were ancillary to the request for injunctive relief.

Southmark insists that the courts below erred in determining that there was no "debt" prior to the execution of the Agreement. We agree.

 We note at the outset that we are in agreement with the bankruptcy court's conclusion that, prior to the execution of the Agreement, the Parks Group's demand for costs and attorneys' fees did constitute a "claim" for purposes of the bankruptcy code. Although the right to payment of these expenditures may have been disputed and even contingent, such a right is nevertheless encompassed by the expansive statutory definition of the term "claim." This conclusion also comports with the legislative history of the statute. The House and Senate Reports state that "[b]y this broadest possible definition [of the term 'claim'] ... the bill contemplates that all legal obligations of the debtor, *no matter how remote or contingent,* will be

able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court." [25] Thus, like the bankruptcy court, we conclude that, prior to the execution of the Agreement, the Parks Group's amicable and judicial demands for costs and attorneys' fees were "claims" within the intendment of the bankruptcy code.[26] On the other hand, we cannot agree with the bankruptcy court's conclusion that this "claim" was not a "debt." Instead, we conclude that the claim is also a debt.

The legislative history of the bankruptcy code explains the relationship between debt and claim: "The terms 'debt' and 'claim' are coextensive: a creditor has a 'claim' against the debtor; the debtor owes a 'debt' to the creditor." [27] Moreover, the Supreme Court has held that the meanings of the terms "debt" and "claim" are coextensive.[28] Indeed, we have proclaimed that, based on Supreme Court authority, "there is no distinction between 'debt' and 'claim' for purposes of the Bankruptcy Code." [29]

In the absence of a compelling reason why this line of authority would not be applicable to the instant case, we conclude that, as the Parks Group had a "claim" for these expenditures prior to the execution of the Agreement, a "debt" of Southmark also existed for these expenditures prior to the execution of the Agreement.[30] Thus, the $3.3 million transfer was on account of an antecedent debt owed by Southmark.

SR & Z nevertheless argues that for Southmark to prevail on the § 547(b)(2) ele-

---

**25.** H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266 (emphasis added); S.Rep. No. 989, 95th Cong., 2d Sess. 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5808 (emphasis added); *see also Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 2153–54, 115 L.Ed.2d 66 (1991) ("Congress intended by [the language of 11 U.S.C. § 101(5)] to adopt the broadest available definition of 'claim.' ").

**26.** *See also In re Hadden,* 57 B.R. 187, 189 (Bankr.W.D.Wis.1986) ("The fact that the court has some discretion in granting or denying reasonable attorneys' fees does not make [the creditor's] right to attorneys' fees so illusory as to fail to fulfill the definition of a claim.").

**27.** H.R.Rep. No. 595, 95th Cong., 1st Sess. 310 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963,

6267; S.Rep. No. 989, 95th Cong., 2d Sess. 23 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5809.

**28.** *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990).

**29.** *In re Lindsey, Stephenson & Lindsey,* 995 F.2d 626, 628 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1053, 127 L.Ed.2d 374 (1994).

**30.** *See In re Energy Coop., Inc.,* 832 F.2d 997, 1002 (7th Cir.1987) (in the context of analyzing whether a transfer was a preference under 11 U.S.C. § 547, stating that "[w]here a claim exists, so does a debt.").

ment in this case, there must be more than the mere existence of a "claim" prior to the execution of the Agreement. SR & Z notes that Congress could have used the word "claim" in § 547(b)(2), but chose instead to use "debt." SR & Z emphasizes that "debt" is defined in § 101(12) as *"liability* on a claim" and thus denotes a more restrictive concept than "claim," i.e., debt is a subset of claim: All debts are claims but not all claims are debts. This argument, however, is simply unavailing in light of the contrary authorities discussed above.

SR & Z further emphasizes that § 547(b)(2) requires that, to be preferential, a transfer must be "for or on account of an antecedent debt *owed* by the debtor before such transfer was made." SR & Z insists that a debt is not "owed" until the debtor becomes "bound to pay" it; that this "owed" requirement further limits the definition of an antecedent debt. Not only does SR & Z fail to cite any authority for this suspect interpretation of the statute, but such an interpretation is contrary to established law.[31] Accordingly, SR & Z gains no support from this specious argument.

We find inescapable, therefore, that the $3.3 million was transferred "for or on account of an antecedent debt owed by the debtor before such transfer."[32] Although the instant case presents a rare if not unique fact situation, it nevertheless falls within the broad statutory language of the preference statute. This conclusion is not only consistent with the statute and the case law, but also comports with the general observation that a settlement agreement resolves preexisting claims. Accordingly, we reverse the judgment of the bankruptcy court and remand for further proceedings consistent with our opinion.

### III.

### CONCLUSION

Even though we affirm the bankruptcy court's denial of Southmark's motion for

leave to file a second amended complaint, we reverse the bankruptcy court's ruling that the $3.3 million transfer was not "for or on account of an antecedent debt owed by the debtor before such transfer."[33] Accordingly, the judgment of the bankruptcy court is

AFFIRMED in part, REVERSED in part, and REMANDED.

---

**31.** *See id.* at 1001 (holding that a creditor's *contingent* claim is a debt for purposes of 11 U.S.C. § 547).

**32.** 11 U.S.C. § 547(b)(2).

