2003 UT 21

**Robert E. WILCOX, Utah Insurance Commissioner, as Liquidator of Southern American Insurance Company, Plaintiff and Appellant,**

v.

**CSX CORPORATION, Defendant and Appellee.**

**No. 20010411.**

Supreme Court of Utah.

May 9, 2003.

---

Douglas M. Monson, Brent D. Wride, Elaine A. Monson, Salt Lake City, for plaintiff.

E. Scott Savage, Samuel O. Gaufin, Eric K. Schnibbe, Salt Lake City, for defendant.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 This case addresses two issues of first impression for this court. The first issue is whether federal bankruptcy law should be used to interpret the voidable preference provisions of Utah Code section 31A–27–321 (2001). Appellant, Wilcox, argues that because there is no prior Utah case law addressing section 31A–27–321, 11 U.S.C. § 547(c) (1988), a "comparable" provision of the Federal Bankruptcy code, should guide this court's statutory interpretation. The second issue is whether appellee, CSX Corporation's, actions satisfy either of the affirmative defenses found in section 31A–27–321 of the Utah Code, namely, the new and contemporaneous consideration defense found in section 31A–27–321(4)(a) and the ordinary course of business defense found in section 31A–27–321(4)(b).[1] We hold that it is proper for this court to rely on 11 U.S.C. § 547(c) of the Federal Bankruptcy code for guidance in interpreting Utah Code section 31A–27–321 and that neither affirmative defense found in section 31A–27–321 has been satisfied. We therefore reverse the decision of the trial court.

## BACKGROUND

¶ 2 The facts in this case are not in dispute. Southern American Insurance Company (SAIC) was incorporated and began providing insurance coverage in 1934. Between July 14, 1979 and July 31, 1982, SAIC sold three insurance policies to CSX Corporation (CSX) and its predecessors. These policies provided CSX with liability coverage for all of its asbestos-related claims. On or about October 3, 1985, CSX's predecessors filed two separate lawsuits against SAIC. On or about January 11, 1990, a predecessor of CSX filed a third lawsuit against SAIC. Each

---

1. In granting CSX Corporation's motion for summary judgment, the trial court found that new and contemporaneous consideration existed and therefore failed to "reach the remaining issues." One of the remaining issues, which was argued in the court below and in the briefs on appeal, is whether CSX Corporation's actions satisfy the ordinary course of business defense found in Utah Code Ann. section 31A–27–321(4)(b). Although the trial court did not rule on this issue, we deem it appropriate to do so here.

of these three claims against SAIC (the asbestos coverage litigation) involved disputes regarding the extent to which SAIC would cover CSX's asbestos liability.[2]

¶ 3 In March of 1991, SAIC and CSX commenced settlement negotiations for the asbestos coverage litigation. On or about October 14, 1991, the parties circulated a settlement letter setting forth the settlement terms and conditions to which SAIC and CSX had agreed. Shortly thereafter, the parties executed the Settlement Agreement (Agreement), with CSX signing on October 17, 1991 and SAIC signing on October 25, 1991. The Agreement obligated SAIC to make three payments totaling $308,000 to CSX in exchange for CSX's agreement to release SAIC from all past, present, and future claims arising from asbestos litigation.

¶ 4 In accordance with the Agreement, SAIC made the following payments to CSX: $102,667 on October 28, 1991, $102,667 on November 26, 1991, and $102,666 on January 2, 1992. Subsequently, on March 25, 1992, the liquidator successfully filed a petition for SAIC's liquidation. The next day, March 26, 1992, the liquidation court issued a liquidation order against SAIC, and on April 10, 1992, the liquidation court declared SAIC insolvent pursuant to sections 31A–1–301(39) and 31A–27–310(4) of the Utah Code.[3] Approximately two years later, on March 25, 1994, the liquidator filed the present action against CSX, claiming that the payments made by SAIC to CSX pursuant to the Agreement were voidable preferences under Utah Code sections 31A–27–321(1)(b) and (c).

### PROCEDURAL HISTORY

¶ 5 On February 2, 2000, CSX moved for summary judgment, arguing that the payments were (1) not voidable preferences as a matter of law because the payments were for new and contemporaneous consideration, (2) made in the ordinary course of SAIC's business and within forty-five days of the date the payments were legally obligated to be paid, and (3) made in exchange for the relinquishment of all past, present, and future asbestos-related claims. On March 30, 2000, the liquidator filed its opposition to CSX's motion and submitted its own motion for summary judgment, arguing that all the elements of a preferential transfer under Utah Code sections 31A–27–321(1)(b) and (c) were met as a matter of law. Oral argument on the cross motion was heard on March 5, 2001, and on March 12, 2001, the district court issued a memorandum decision, ruling that since "the Settlement Agreement between SAIC and CSX released CSX's existing and future claims[,] ... the payments received by CSX were for new and contemporaneous consideration." The district court entered an order on April 3, 2001 granting CSX's motion for summary judgment and denying the liquidator's motion. The liquidator appealed.

### STANDARD OF REVIEW.

¶ 6 " 'Generally, we review a trial court's legal conclusions for correctness, according the trial court no particular deference.' " *Wilson Supply, Inc. v. Fradan Mfg. Corp.*, 2002 UT 94, ¶ 11, 54 P.3d 1177, 1181 (quoting *Orton v. Carter*, 970 P.2d 1254, 1256 (Utah 1998)). A determination of whether any or all of SAIC's payments to CSX constitute a voidable preference under the meaning of section 31A–27–321 is a matter of law.

### ANALYSIS

¶ 7 The applicable provisions of Utah Code section 31A–27–321 at issue in this case are as follows:

(1)(a) [A] "preference" means a transfer of any of the property of an insurer to or for the benefit of a creditor, for or on account of an antecedent debt, made or allowed by the insurer within one year before the

---

**2.** Each law suit alleged, "[s]ubstantial premiums have been expended to purchase such liability or indemnity policies, and all applicable conditions precedent under such policies have been met," and "[e]ach defendant insurance company is obligated under its liability or indemnity insurance policies to pay in full all sums which plaintiff shall become legally liable to pay, through judg-ment, settlement or otherwise, in the asbestos-related bodily injury lawsuits."

**3.** Section 31A–27–310(4) permits "the [insurance] commissioner [to] petition the court to declare the insurer insolvent."

filing of a successful petition for rehabilitation or liquidation....

(b) Any preference may be avoided by the rehabilitator or liquidator, if:

(i) the insurer was insolvent at the time of the transfer; [or]

(ii) the transfer was made within four months before the filing of the petition[.]

Section 31A–27–321 allows a liquidator to recover certain preferential payments made to an insurance company's creditors prior to liquidation. Prohibiting preferential payments to creditors prevents an insurer from paying off its favorite creditors on the eve of liquidation. *Pine Top Ins. Co. v. Bank of Am. Nat'l Trust & Sav.*, 969 F.2d 321, 324 (7th Cir.1992) (referring to the policy behind a federal bankruptcy statute to interpret an Illinois state insurance statute). Such a practice inevitably diminishes the value of the insurer's estate and leads to an inequitable distribution to any remaining similarly situated creditors. *Futoran v. Rush (In re Futoran)*, 76 F.3d 265, 267 (9th Cir.1996); *Vieira v. Anna Nat'l Bank (In re Messamore)*, 250 B.R. 913, 916 (Bankr.S.D.Ill.2000). A voidable preference may nevertheless be non-preferential if one of the affirmative defenses found in section 31A–27–321 is established. CSX alleges, and has the burden of proving,[4] the following section 31A–27–321 affirmative defenses at issue in this case:

(4) The receiver may not avoid a transfer of property under this section for or because of:

(a) a new and contemporaneous consideration; [or]

(b) the payment, within 45 days after a debt is incurred, of a debt incurred in the ordinary course of the business of the insurer and according to normal business terms[.]

No prior Utah case law has interpreted these two statutory defenses. We therefore discuss the relevance of using a similar provision of the Federal Bankruptcy code, 11 U.S.C. § 547(c), in the interpretation of the new and contemporaneous consideration defense and the ordinary course of business defense found in Utah Code section 31A–27–321(4).

## I. RELEVANCE OF 11 U.S.C. § 547(c) TO UTAH CODE SECTION 31A–27–321

¶ 8 "When faced with a question of statutory construction, 'we seek to give effect to the intent of the legislature in light of the purpose the act was meant to achieve.'" *State v. Ostler*, 2001 UT 68, ¶ 7, 31 P.3d 528 (quoting *Gutierrez v. Medley*, 972 P.2d 913, 915 (Utah 1998)). We first interpret the statute according to its plain language; nevertheless, "'[i]f we find the provision ambiguous ... we then seek guidance from the legislative history and relevant policy considerations.'" *Ostler*, 2001 UT 68 at ¶ 7, 31 P.3d 528 (quoting *In re Worthen*, 926 P.2d 853, 866 (Utah 1996)); *see also Biddle v. Washington Terrace City*, 1999 UT 110, ¶ 14, 993 P.2d 875; *Schurtz v. BMW of N. Am., Inc.*, 814 P.2d 1108, 1112 (Utah 1991). We rely upon these rules of statutory interpretation in deciding whether to use the legislative history and policy considerations behind 11 U.S.C. § 547(c) for guidance in interpreting the Utah insurance liquidation statute at issue.

¶ 9 Courts have consistently explained that "[t]he purpose of 11 U.S.C. § 547 is to 'accomplish proportionate distribution of the debtor's assets among its creditors, and therefore to prevent a transfer to one creditor that would diminish the estate of the debtor that otherwise would be available for distribution to all.'" *In re Futoran*, 76 F.3d at 267 (quoting *In re Nucorp Energy, Inc.*, 902 F.2d 729, 733 (9th Cir.1990)); *see also In re Messamore*, 250 B.R. at 916 (stating that a preferential transfer "mak[es] it impossible for similarly situated creditors to obtain as great a percentage as the favored creditor"); *Hays v. DMAC Inv., Inc. (In re RDM Sports Group, Inc.)*, 250 B.R. 805, 811 (Bankr. N.D.Ga.2000) (citing H.R.Rep. No. 95 595 at

---

4. Pursuant to 11 U.S.C. § 547(g), "[t]he Trustee bears the burden of proving that the transfer ... is avoidable under section 547(b)." *Rieser v. Landis & GYR Powers, Inc. (In re Bownic Insulation Contractors, Inc.)*, 134 B.R. 261, 264 (Bankr. S.D.Ohio 1991). However, once that burden has been met, the burden of proof shifts to the party asserting the "substantially contemporaneous" and/or "ordinary course of business" affirmative defenses found in § 547(c). *Id.*

177–78 (1978)) (noting that "equality of distribution" is a "fundamental tenet[ ]" of bankruptcy law and that "the central purpose of § 547 is to discourage creditors 'from racing to the courthouse to dismember the debtor during his slide into bankruptcy' ") (citation omitted); *Miniscribe Corp. v. Keymarc, Inc. (In re Miniscribe Corp.)*, 123 B.R. 86, 90 (Bankr.D.Colo.1991) (stating that "[t]he purpose of the preference statute is to discourage creditors from engaging in unusual collection practices which help dismember the debtor and hasten its slide into bankruptcy").

¶ 10 Section 547 of the Federal Bankruptcy code provides that a trustee in bankruptcy

(b) ... may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were ... under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

However, sections 547(c)(1) and (2) of the Federal Bankruptcy code also provide that a

debtor's transfer, which satisfies the above criteria, may nevertheless be deemed non-preferential if the transfer was

(1)(A) intended by the debtor and the creditor to ... be a contemporaneous exchange for new value given to the debtor; and

(1)(B) in fact a substantially contemporaneous exchange; ... [or]

(2)(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(2)(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(2)(C) made according to ordinary business terms[.]

■ ¶ 11 SAIC contends that "[b]ecause the policy underlying the preference doctrine under state insurance liquidation law is the same as that under federal bankruptcy law," this court should use 11 U.S.C. § 547(c) of the Federal Bankruptcy code as guidance in interpreting the affirmative defenses found in Utah Code section 31A–27–321. On the other hand, CSX argues that the relevant provisions of section 31A–27–321 are not ambiguous on their face. For example, CSX asserts that the terms "consideration" and "ordinary course of business" have only one meaning respectively, precluding the court from looking outside the language of the statute.

¶ 12 We find that an ambiguity exists in the statute and that it is therefore proper to look to legislative history and policy considerations for guidance in our statutory interpretation. The ambiguity lies in the fact that, although the term "consideration" is a so-called term of art, it is not as uniformly defined in all contexts as appellee alleges.[5] CSX argues that the legislature's use of the

---

5. According to CSX, the operative definition of the term "consideration" should be as follows: "The cause, motive, price or impelling influence which induces a contracting party to enter into a contract. The reason or material cause of a contract. Some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other." (quoting *Black's Law Dictionary* 306 (6th ed.1990)). CSX further argues that the term "consideration" in Utah Code

section 31A–27–321(4)(a) should be synonymous with "fair consideration" as defined in section 31A–27–102(1)(h). We find this argument unpersuasive in light of the fact that the term "fair consideration" is specifically used in three different sections of the chapter, but not in the voidable preference provisions at issue here. *See, e.g.*, Utah Code Ann. §§ 31A–27–319 to 321. We simply cannot assume that the legislature intended "new and contemporaneous consideration" to mean "fair consideration."

term "consideration" in section 31A–27–321(4)(a) instead of the term "value," which is used in 11 U.S.C. § 547(c)(1)(A), evidences that the Utah legislature's choice of words was intentional. CSX supports this contention by citing the fact that section 31A–27–321(4)(d) uses the term "value" instead of "consideration." Therefore, according to CSX, the legislature must have defined and used the terms differently.

¶ 13 Legislative history suggests that the terms "value" and "consideration" are not mutually exclusive but are often used interchangeably. Because 11 U.S.C. § 109(b)(2) excludes "domestic insurance companies" from being debtors under Chapter 7 liquidation proceedings, insurance companies are subject to state liquidation statutes. Most, if not all, state insurance liquidation statutes were based on federal bankruptcy law.[6] This is most likely true with regard to section 31A–27–321 because even though 11 U.S.C. § 547(c) presently uses the phrase "contemporaneous exchange for new value" to describe one of the affirmative defenses to the federal preference rule, the 1898 Bankruptcy Act used the term "new and contemporaneous consideration."[7] The Bankruptcy Act of 1898, ch. 541, 30 Stat. 544 (repealed 1978).

¶ 14 Additionally, the terms "value" and "consideration" have often, in the voidable preference context, been used interchangeably. For example, section 60(b) of the 1898 Bankruptcy Act states, "where such purchaser or lienor has given less than such *value,* he shall nevertheless have a lien upon such property, but only to the extent of the *consideration* actually given by him." In a more recent federal bankruptcy case, the court stated:

> The payments in the instant case bear none of the earmarks of a contemporaneous exchange. The parties to the litigation settled upon a penalty to cure violations and then they set forth a schedule for payment. There was no *new consideration,* no *contemporaneous exchange for new value,* only payment upon an antecedent debt to satisfy a fine on long standing violations.

*Fisher v. New York City Dep't of Hous. Pres. and Dev. (In re Pan Trading Corp.),* 125 B.R. 869, 876–77 (Bankr.S.D.N.Y.1991) (emphasis added).

■ ¶ 15 The definition of "consideration" CSX urges this court to adopt is overly broad in that it includes an essential element of contract formation. However, the validity of the contractual agreement between CSX and SAIC is not at issue here. The issue here is whether the payments made pursuant to the Agreement constituted a voidable preference and are therefore out of the liquidator's reach. In our view, CSX's interpretation of the terms "consideration" and "ordinary course of business" would produce a result contrary to the fundamental underpinnings of this type of liquidation statute. We must consider the terms used by this statute in light of the statute's basic structure and purpose to ensure that the policy justification behind the statute (the equitable distribution of the debtor's assets) is not undermined. When there is no legislative history for the state statute, as is the case here, we are comfortable following the Seventh Circuit's rule of thumb: "[W]hen confronted with a voidable preference dispute under state insurance law, it is customary to look to federal bankruptcy law for guidance." *Pine Top Ins. Co.,* 969 F.2d at 324; *see also Stamp v. Ins. Co. of N. Am.,* 908 F.2d 1375, 1379 (7th Cir.1990).

## II. ANTECEDENT DEBT

¶ 16 A receiver may avoid a transfer of property when the "property of an insurer" is transferred "to or for the benefit of a creditor, *for or on account of an antecedent debt,* made or allowed by the insurer within one year" from the filing of a successful

---

**6.** Milton S. Wolke, Jr., *Insurance Companies and Voidable Preferences,* 18 Conn. L.Rev. 227, 228, 261 (1986) (stating that "voidable preference sections [of state statutes] are based on either the 1938 Chandler Act, section 60 or one of the prior amendments to the 1898 Bankruptcy Act").

**7.** Section 60(a)(8) of the Bankruptcy Act of 1898 states, "a transfer wholly or in part, for or on account of *a new and contemporaneous consideration* shall, to the extent of such consideration and interest thereon and the other obligations of the transferor connect therewith, be deemed to be made or suffered at the time of the transfer."

liquidation petition, unless (1) the transfer is made for "new and contemporaneous consideration," or (2) the payment is made "within 45 days after a debt is incurred ... in the ordinary course of the business of the insurer and according to normal business terms." Utah Code Ann. §§ 31A–27–321(1)(a), (4)(a), (4)(b) (emphasis added).

¶17 Before addressing the affirmative defenses, we must first determine whether SAIC made payments to CSX "for or on account of an antecedent debt." *Id.* § 31A–27–321(1)(a). Under the Bankruptcy Code, "debt" is defined as "liability on a claim." 11 U.S.C. § 101(1). "A debt is antecedent if it is incurred before the transfer." *Southmark Corp. v. Schulte Roth & Zabel,* 88 F.3d 311, 316–17 (5th Cir.1996); *In re Miniscribe Corp.,* 123 B.R. at 90. The definition of "claim" in the federal bankruptcy context is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). The Seventh Circuit has reminded us that "the concepts of debt and claim [in the federal bankruptcy context] are co-extensive: a creditor has a 'claim' against the debtor; the debtor owes a 'debt' to the creditor." *Energy Coop., Inc. v. SOCAP Int'l (In re Energy Coop., Inc.),* 832 F.2d 997, 1001 (7th Cir.1987) (stating, "when a claim exists, so does a debt") (citation omitted); *Southmark Corp.,* 88 F.3d at 316–17. "In other words, when a creditor has a claim against the debtor—even if the claim is unliquidated, unfixed, or contingent—the debtor has incurred a debt to the creditor." *In re Energy Coop., Inc.,* 832 F.2d at 1001. Congress gave the term "claim" the "broadest possible definition"[8] so as to include it within the meaning of the term "debt"[9] and to ensure an equitable distribution to *all* similarly situated creditors. Without this broad definition, Congress feared that the preference statute would be meaningless, allowing would-be-debtors to escape the requirements of the statute and avoid the preference limitation altogether, thereby diminishing the value of the estate for other creditors.

¶18 The Utah Legislature has defined "claim" as "a request or demand on an insurer for payment of benefits according to the terms of an insurance policy," Utah Code § 31A–1–301(19), and "creditor" as "a person, including an insured, having any claim, whether: (a) matured; (b) unmatured; (c) liquidated; (d) unliquidated; (e) secured; (f) unsecured; (g) absolute; (h) fixed; or (i) contingent," *Id.* § 31A–1–301(28). It seems consistent with the intent of this preference statute (to preserve an equitable distribution of insurer's assets upon liquidation) that the term "claim," as defined by the state legislature, be synonymous with the term "debt." Here, CSX (the insured) was clearly a creditor with an unmatured claim, and if CSX was

---

**8.** Legislative history confirms just how broadly the term "claim" was intended to reach: "[b]y this broadest possible definition [of the term "claim"] ... the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." *Southmark Corp.,* 88 F.3d at 317 (citing H.R.Rep. No. 95–595 at 309 (1977)).

**9.** The United States Supreme Court concurred with this interpretation.

Section 101(12) of the Bankruptcy Code defines "debt" as a "liability on a claim." This definition reveals Congress' intent that the meanings of "debt" and "claim" be coextensive (citation omitted). Thus, the meaning of "claim" is crucial to our analysis. A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliq-uidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(4)(A). As is apparent, Congress chose expansive language in both definitions.... For example, to the extent the phrase "right to payment" is modified in the statute, the modifying language ("whether or not such right is ...") reflects Congress' broad rather than restrictive view of the class of obligations that qualify as a "claim" giving rise to a "debt." *See also* H.R.Rep. No. 95–595 (describing definition of "claim" as "broadest possible" and noting that Code "contemplates that all legal obligations of the debtor ... will be able to be dealt with in the bankruptcy case"); *accord,* S.Rep. No. 95–989.

*Pa. Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990).

the creditor, SAIC must therefore have been the debtor.[10]

¶ 19 Additionally, a crucial factor in whether a transfer was made for or on account of an antecedent debt is determining when the debt, or in this case the claim, arose. *Ogden v. Hazen*, 243 B.R. 104, 112 (10th Cir.B.A.P. (Utah) 2000) (noting that in order to determine whether a debt was antecedent, the court must first "determine if the record established that the Appellant had a claim against the Debtor before the transfer"). According to section 31A–1–301(19), CSX's asbestos-related claims against SAIC arose when CSX or its predecessors "requested" payment from SAIC regarding its asbestos-related claims, all of which arose under CSX's insurance policy effective for the 1979–1982 coverage period. The facts do not reveal exactly when CSX requested payment from SAIC on those claims. However, the three lawsuits filed by CSX or its predecessors were all filed on or before January 11, 1991. The Agreement and/or any of the three payments arising out of the Agreement did not exist until October 1991. Thus, SAIC's three payments arose "for or on account of an antecedent debt" because CSX's "claims" against SAIC constituted a "debt," and the debt was "incurred before the transfer."

■■ ¶ 20 Even though CSX contends that federal bankruptcy law should not guide our analysis in this case, CSX relies upon *In re White River Corp.*, 799 F.2d 631, 633 (10th Cir.1986), a federal bankruptcy case, for the proposition that monthly payments under a lease agreement do not constitute debts until "the actual dates the rent [is] due." Therefore, CSX argues, "the debts for which the payments were made were incurred when actually due under the agreement." It is true that "a debt is incurred when a debtor first becomes legally bound to pay." *Id.* at 632; *see also In re RDM Sports Group, Inc.*, 250 B.R. at 812; *In re Pan Trading Corp.*, 125 B.R. at 875. However, "legal liability [does not have to be] established through litigation," especially in a preference context. *Cybermech, Inc. v. Royal Cake Co., Inc.*, 13 F.3d 818, 822 (4th Cir.1994). As we have

already stated, CSX's claims arose, under section 31A–27–321, when CSX "request[ed] ... payment of benefits according to the terms of [its] insurance policy" with SAIC. Utah Code Ann. § 31A–1–301(19).

■■ ¶ 21 CSX's analogy to lease payments becoming debts upon their due date is incongruous with the facts of this case. Courts have stated that "a debt for rent is incurred as the lease progresse[s] rather than ... when the lease [is] executed." *Iowa Premium Serv. Co. v. First Nat'l Bank (In re Iowa Premium Serv. Co.)*, 695 F.2d 1109, 1112 n. 7 (8th Cir.1982) (applying this reasoning to determine that interest payments become debts upon their due date, not when the lease agreement is executed but when the monthly lease payments become due); *see also Armstrong v. Gen. Growth Dev. Corp. (In re Clothes, Inc.)*, 35 B.R. 489, 491–92 (Bankr.D.N.D.1983). Rent or lease payments are distinguishable from payments made pursuant to a settlement agreement in that legal liability in the enforcement of the terms of the agreement attaches on the effective date of the settlement agreement, not on the date the payments are due. Nevertheless, SAIC's legal obligation to indemnify CSX was not incurred upon execution of the Agreement; it arose from CSX's insurance policy during the 1979–1982 coverage period. "[A] settlement is merely the method in which a claim is negotiated and satisfied by the parties prior to trial. The fact that a claim is agreed to immediately by the insurer, or negotiated over a period of time, does not negate the fact that the claim arose out of the insurance policy...." *Buggage v. Yellow–Checker Cab Co.*, 623 So.2d 906, 907 (La.Ct.App.1993); *see also Upstairs Gallery, Inc. v. Macklowe West Dev. Co. (In re Upstairs Gallery, Inc.)*, 167 B.R. 915, 919 (9th Cir.B.A.P. (Cal.) 1994) (stating, "[m]erely because the parties settled and this settlement resulted in payment to the creditor, it does not follow that the settlement creates a new obligation for which the payment may be deemed outside the scope of § 547(b)(2) and as a 'contemporaneous exchange for new value' under § 547(c)(1)"); *In re Pan Trading*

---

**10.** "A debt may exist even though it has not been valued conclusively and even though there is a bona fide dispute about the obligation to pay." *Stamp*, 908 F.2d at 1380.

*Corp.*, 125 B.R. at 875 (noting that "[u]nless an installment contract is made in the ordinary course of business, a debtor generally becomes legally obligated on it on the date when the debtor originally undertook the obligation, not when each payment becomes due"). In summary, SAIC became legally obligated to indemnify CSX for any of CSX's asbestos-related claims when it sold CSX the insurance policy. The three payments provided in the Agreement were payments made pursuant to that policy. Therefore, the execution of the Agreement did not create SAIC's obligation to indemnify CSX[11] or its predecessors; the policy created the obligation.[12] For purposes of section 31A–27–321, SAIC incurred the debt no later than when the policy period ended in 1982. Therefore, the liquidator was entitled to avoid SAIC's three payments "made for or on account of an antecedent debt," unless CSX can prove one of the statutory affirmative defenses.

## III. NEW AND CONTEMPORANEOUS CONSIDERATION

¶ 22 In its memorandum decision, the district court held that, since "the Settlement Agreement between SAIC and CSX released CSX's existing and future claims[,] . . . the payments received by CSX were for new and contemporaneous consideration." We disagree with this conclusion.

¶ 23 We agree with SAIC that CSX must prove the payments it received from SAIC were both "new" and "contemporaneous." First, SAIC's payments to CSX did not constitute "new" consideration because a release of future liability under the policy and a foregone right to judgment with respect to the policy are not new and contemporaneous consideration. The general rule is that "[f]orbearance from exercising

pre-existing rights does not constitute new value." *Am. Bank v. Leasing Serv. Corp. (In re Air Conditioning, Inc. of Stuart)*, 845 F.2d 293, 298 (11th Cir.1988) (holding that "[a]n agreement by an undersecured creditor to forego its right to foreclose on collateral cannot be treated as new value"); *In re RDM Sports Group, Inc.*, 250 B.R. at 817 (defining "forbearance" as "[t]he act of refraining from enforcing a right, obligation, or debt" and holding that "releasing a debtor from its contractual obligations does not fall within § 547(a)(2)'s definition of new value and is not the equivalent of new value"); *Clark v. Frank B. Hall & Co. of Colo. (In re Sharoff Food Serv., Inc.)*, 179 B.R. 669, 677–78 (Bankr.D.Colo.1995) (stating that "[m]ost [c]ourts do not consider forbearance from terminating an agreement such as a lease or insurance as new value"); *Bioplasty, Inc. v. First Trust Nat'l Ass'n (In re Bioplasty, Inc.)*, 155 B.R. 495, 499–500 (Bankr.D.Minn. 1993) (holding that a dismissal of securities claims and release of injunction was not new value under federal bankruptcy law); *In re Pan Trading Corp.*, 125 B.R. at 876–77 (holding that "forbearance from continuing a lawsuit does not create new value" and that a failure "to prove the specific value of [the] alleged forbearance" did not constitute "new consideration"); *Levine v. Cent. States, Southeast; Southwest Areas Pension Fund (In re Ottawa Cartage, Inc.)*, 55 B.R. 371, 376 (Bankr.N.D.Ill.1985) (holding that "forbearance from obtaining an immediate judgment . . . did not enhance [debtor's] estate" and was therefore not new value).

¶ 24 The requirement that the consideration be "new" is to allow the insurer "to procure necessary goods and services" that do not diminish the value of the insurer's estate. *In re Pan Trading Corp.*, 125

---

11. The October 14, 1991 settlement letter, which set forth the following terms and conditions, stated, "This sum shall be in full satisfaction of any claim by CSX against the policies issued by Southern for any losses due to Asbestos–Related Claims, past, present, or future, whether or not asserted in the [three lawsuits brought by CSX's predecessors]." In our view, this clearly demonstrates that both parties understood the payments to be in satisfaction of SAIC's obligation arising under the indemnification policy during 1979–1982, the effective duration of the policy.

12. The policy provided, "The company will indemnify the insured for all sums which the insured shall become legally obligated to pay as damages . . . because of personal injury or property damage." SAIC further agreed that it would indemnify CSX "with respect to all ultimate net loss because of personal injury which occurs during each annual period while this policy is in force commencing from its effective date."

B.R. at 876 (referring to the "new value" exception of § 547 of the Bankruptcy Code). In this case, SAIC did not receive any goods or services from CSX. The only thing SAIC received was CSX's promise to not pursue any further litigation relating to the insurance policy. Such forbearance is not "new consideration" under Utah Code section 31A–27–321.

¶ 25 Second, we must determine whether CSX gave SAIC "contemporaneous"[13] consideration. We previously established that the three payments provided for in the Agreement between CSX and SAIC were in satisfaction of an antecedent debt. Thus, CSX and SAIC were not engaging in a contemporaneous transaction but were settling a pre-existing business obligation that arose under the insurance policy effective between 1979–1982. No new consideration was given contemporaneously.

¶ 26 We find the above conclusions to be in harmony with the policy behind Utah's voidable preference provision. The policy behind the new and contemporaneous consideration defense is that a debtor should not be able to make transfers on the eve of liquidation that "deplete[ ] [the debtor's assets] to the detriment of the other creditors." *In re Futoran,* 76 F.3d 265, 267 (9th Cir. 1996); *see also In re RDM Sports Group, Inc.,* 250 B.R. at 816 (stating "the theory behind the new value exception is that a creditor who truly gives new value in exchange for a preferential transfer has not depleted the debtor's estate to the detriment of other creditors"); *Charisma Inv. Co. v. Airport Sys., Inc. (In re Jet Fl. Sys., Inc.),* 841 F.2d 1082, 1082–84 (11th Cir.1988). Another court has stated,

> When a creditor threatens to exercise a legal remedy against a debtor, and in exchange for not so doing extracts a payment for antecedent debt, nothing of value has

accrued to the debtor estate to compensate other creditors for the loss of that payment. . . . Such a transaction falls squarely within the ambit of the preference law, rather than within its exceptions.

*Womack v. Houk (In re Bangert),* 226 B.R. 892, 903 (Bankr.D.Mont.1998) (citation omitted). To be consistent with the policy behind the federal preference statute, we conclude that new consideration exists when the value of the estate is enhanced by the creditor's actions. *See, e.g., In re Sharoff Food Serv.,* 179 B.R. at 677. The Utah Code endorses this same rationale under the voidable preference statute: A transfer is preferential when "the effect of [the] transfer may enable the creditor to obtain a greater percentage of his debt than another creditor of the same class would receive." Utah Code Ann. § 31A–27–321(1)(a). Today's holding should not be construed to require that a bargained-for release or forbearance does not constitute valid consideration in every instance. *See, e.g., Peirce v. Peirce,* 2000 UT 7, ¶¶ 21, 27–28, 994 P.2d 193 (holding that husband's bargained-for consideration in a contract context was "forbearance from giving away substantial portions of his property before his death"). However, the value of such a release or forbearance in a voidable preference context is too speculative and, in some instances, may never be added to the debtor's estate. Ultimately, public policy supports protecting the debtor's estate from being hastily diminished on the eve of bankruptcy or liquidation for the benefit of all similarly situated creditors.

¶ 27 CSX relies upon the holdings in *Lewis v. Diethorn,* 893 F.2d 648 (3d Cir.1990), and *Nelson Co. v. Amquip Corp.,* 128 B.R. 930 (Bankr.E.D.Pa.1991), to support its argument that "a release of claims and termination of a lawsuit through a settlement agreement may be 'new value.'" We find neither case persuasive. *Lewis*[14] held that the debtor, having

**13.** The Federal Bankruptcy code, 11 U.S.C. § 547(c)(1)(B), uses the term "substantially contemporaneous." Due to the fact that SAIC's debt was incurred during the policy period between 1979–1982, and the payments were made in October and November of 1991 and January of 1992, there is no question that the payments were not contemporaneous to any exchange, even if there had been "new" consideration, which in this case there was not. We therefore find it unnecessary to interpret the exact meaning of the "contemporaneous" element of the new and contemporaneous consideration defense at this time.

**14.** In *Lewis,* the parties negotiated a settlement agreement whereby the debtor made payments to

received "freedom from the risk of [future] litigation," had satisfied the new value defense under 11 U.S.C. § 547. 893 F.2d at 650. Both *Lewis* and *Nelson* have been soundly criticized and are inconsistent with the majority of federal cases dealing with the "exchange for new value" defense that we have cited in this opinion.[15] Under the facts of this case, CSX has not proven the new and contemporaneous consideration defense under section 31A–27–321(1)(a).

## IV. ORDINARY COURSE OF BUSINESS

¶ 28 Section 31A–27–321(4)(b) of the Utah Code provides that a "receiver may not avoid a transfer of property" if "the payment" is made "within 45 days after a debt is incurred ... in the ordinary course of the business of the insurer and according to normal business terms." CSX contends that the liquidator may not avoid the three payments at issue in this case because each element of the ordinary course of business provision has been satisfied.

¶ 29 We hold that CSX has not sufficiently established this affirmative defense. First, because we previously determined that SAIC's payments to CSX were made for or on account of an antecedent debt and that SAIC's debt arose from the 1979–1982 policy period, we conclude that the payments were not made within forty-five days after the debt was incurred; all three payments were made after October 1991.

¶ 30 Second, we also hold that the payments were not made in the ordinary course of SAIC's business. To prove a transfer is non-preferential under the ordinary course of business exception, the creditor must prove:

(1) that the transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, (2) that the transfer was made in the ordinary course of business or financial affairs of the debtor and the transferee, and (3) that the transfer was made according to ordinary business terms.

*Fid. Sav. & Inv. Co. v. New Hope Baptist,* 880 F.2d 1172, 1177 (10th Cir.1989). The purpose behind this exception is " 'to leave undisturbed normal financing relations.' " *Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners),* 12 F.3d 1549, 1553 (10th Cir.1993). Furthermore, "[i]t discourages 'unusual action' that may favor certain creditors or hasten bankruptcy by alarming other creditors and motivating them to force the debtor into bankruptcy to avoid being left out." *Id.* (citation omitted). Normal financing relations are "the kinds of terms that ... [are] use[d] in ordinary cir-

---

settle pending litigation and the creditor agreed "to discontinue their suit ... and to lift the *lis pendens* on the property" at issue in the litigation. *Id.* at 649.

15. One court noted:

[T]he defendants argue that the transfer was made, not on account of such antecedent debt, but rather to eliminate the costs and risks associated with litigation. The defendants rely on *Lewis v. Diethorn,* 893 F.2d 648, 650 (3d Cir.1990). Although *Diethorn* did hold that the settlement payments in the case before it were made in consideration for the termination of the lawsuit and release of a *lis pendens,* I am not persuaded by the Third Circuit's holding. The opinion contains no analysis whatsoever, and simply makes the conclusory statement that the payments were made for one reason rather than another. *Diethorn,* 893 F.2d at 650.

Even if I could be convinced that *Diethorn* reached the proper conclusion on the facts before it, I would distinguish it from the case before me today.... Certainly the debtor's driving concern in settling the class action suit, as in any large commercial dispute, was the risk of liability. The settlement payments were made in light of such risk, and therefore were on account of the antecedent debt.

*In re Bioplasty, Inc.,* 155 B.R. at 499. *See also In re RDM Sports Group, Inc.,* 250 B.R. at 813–14 (declining to follow *Lewis* and emphasizing that the debtor "incurred a legal obligation ... long before the parties reached a settlement."); *Lease–A–Fleet, Inc. v. Wolk (In re Lease–A–Fleet, Inc.),* 151 B.R. 341, 352 (Bankr.E.D.Penn.1993) (distinguishing *Lewis* and *Nelson* by the fact that the two cases "appear driven by the respective courts' conclusion that what the parties exchanged in the respective settlements was substantially equivalent"). It is fruitless to engage in such an "equivalent" analysis in the present matter because we have no way of knowing the value of CSX's possible future claims against SAIC. Such an analysis would be premised upon mere speculation and would therefore lack any merit.

cumstances, when debtors are *healthy*." [16] *Id.* (emphasis added). The court may look at industry standards as a whole only where the history between the debtor and creditor is insufficient to determine whether the business relations were "ordinary." *In re Energy Coop., Inc.*, 832 F.2d at 1004–05.

¶ 31 We now examine the "prior course of conduct" between SAIC and CSX to determine whether the payments were made to CSX in the ordinary course of business and according to normal business terms. *In re Miniscribe Corp.*, 123 B.R. at 93. CSX argues that SAIC's payments were made in the ordinary course of SAIC's business because reviewing, settling, and paying disputed claims is "at the heart" of the insurance industry. We agree with CSX's contention on its face; however, settling an existing lawsuit is much different than settling a normal claim with an insured. An insurer reviews, settles, and pays disputed claims regularly. However, when relations between insurer and insured reach the courts, such action is not normal and certainly demonstrates an unhealthy relationship between the debtor and the creditor. These are not the sorts of transactions that the ordinary course of business exception was intended to protect. Thus, we hold that CSX's ordinary course of business defense under section 31A–27–321(4)(b) fails.

## CONCLUSION

¶ 32 We reverse the trial court's order granting summary judgment in favor of CSX because of our holding that SAIC's payments to CSX were made for or on account of an antecedent debt. Additionally, we hold that CSX failed to satisfy the requirements behind the new and contemporaneous consideration defense found in section 31A–27–321(4)(a) and the ordinary course of business defense found in section 31A–27–321(4)(b).

¶ 33 Associate Chief Justice DURRANT, Justice RUSSON, Judge GREENWOOD, and Judge EVES concur in Chief Justice DURHAM's opinion.

---

16. "For example, filing a lawsuit to enforce a debt may not be unusual when a debtor does not pay, but payments according to a settlement

¶ 34 Having recused themselves, Justice HOWE and Justice WILKINS do not participate herein; Court of Appeals Judge PAMELA T. GREENWOOD, and District Judge J. PHILIP EVES sat.

---

agreement are not according to ordinary business terms." *In re Meridith Hoffman Partners*, 12 F.3d at 1553.